STATE of Iowa, ex rel. Thomas J. MILLER, Attorney General, Appellee,

v.

AMERICAN PROFESSIONAL MARKETING, INC.; American Professional Marketing, Inc.; Johnny Brown; Betty L. Brown; and Glenn J. Beadle, Appellants.

No. 85–141.

Supreme Court of Iowa.

Feb. 19, 1986.

F. Richard Lyford and Barbara G. Barrett, of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellants.

Thomas J. Miller, Atty. Gen., and Richard L. Cleland and James M. Peters, Asst. Attys. Gen., for appellee.

Mark A. Critelli, of Comito & Capps, Des Moines, for amicus curiae Direct Selling Assn.

SCHULTZ, Justice.

Defendants appeal from a district court determination that their multilevel marketing programs are illegal referral sales plans. The court permanently enjoined defendants' sales practices in the state. In this appeal, defendants assert that their programs are neither pyramiding nor illegal referral merchandise sales plans banned by Iowa Code section 714.16(2). We agree with defendants' contention and reverse the trial court's ruling.

The attorney general commenced this action on behalf of the State against two corporations and its officers. Although the two corporations, one the successor of the other, bore the same name, American Professional Marketing, Inc., each was assigned a different file number by the state of Oklahoma. Also named as defendants were three Oklahoma residents, Johnny Brown, Betty L. Brown, and Glenn J. Beadle, who served as officers and directors of the corporation. For convenience we shall refer to all defendants collectively as "APMI." The original action charged APMI with a different consumer fraud violation; however, that dispute was settled. Prior to settlement, the State amended its petition to claim that defendants conducted a multilevel referral sales program that is allegedly per se illegal under section 714.-16(2)(b). The State sought to enjoin defendants from continuing their marketing plans.

The issues were presented to the trial court on a stipulation of facts.[1] At issue was defendants' two marketing programs, an original plan that was operative through April 1984 and a new plan that was implemented in May of 1984. Included in the stipulation was a detailed outline of each plan and a report prepared by Peter Max, an expert in the area of the economic effects and consequences of multilevel marketing plans. Max's report concluded that the plans in question were not a "pyramid" in form or fact and were, instead, typical of most direct selling organizations. The parties stipulated that other multilevel direct sales plans operate in Iowa and are not the subject of pending legal action. Additionally, the stipulation noted that a direct sales marketing plan in which a distributor hires salespersons could operate legally in the state if the salespersons have no right to recruit others and they profit only from sales to consumers.

The stipulated facts also detailed the structure of the two marketing plans. In general, APMI, through its multilevel marketing program, purports to enlist the services of men and women throughout the country to sell its product. Although APMI markets products other than a gasoline additive, the fuel additive was the primary focus of its marketing plans in Iowa. In order to enter the program, participants must attend a meeting conducted by an APMI sponsor and purchase a sales kit for $38 which includes a monthly subscription to APMI's magazine and extensive sales literature, but no product samples.[2]

All participants in the program are independent contractors. An individual enters the program as a product representative. A product representative becomes a super-

---

1. All the parties, except Glenn J. Beadle, stipulated that these were a complete set of facts in regard to the marketing plans.

2. This is APMI's current marketing plan. In the original plan the sales kit was sold at cost and contained two samples.

visor[3] by selling or consuming 75 percent of his initial two cases (12 bottles to a case) of product in any two consecutive months (i.e. 18 bottles). The product, the fuel additive, is contained in pint bottles and is sold to product representatives at $117.00 a case, or $9.75 a bottle.[4] A supervisor can become a director by filing a retail sales report with APMI and purchasing, either personally or through his downline organization, 120 cases of product within six consecutive months. A sales agreement requires that the product be sold by supervisors and directors to product representatives or at retail.

Profits are earned in the marketing system by (1) retailing or (2) wholesaling the product. Persons at all three levels may sell at retail. A personal representative purchases the product from his sponsor at 25 percent off the suggested retail price.[5] Personal representatives are not permitted to sponsor other personal representatives or purchase the product directly from APMI. A supervisor purchases the product directly from APMI at 30 percent off the suggested retail price. Therefore, a supervisor makes a 5 percent profit on sales to downline product representatives and a 30 percent profit on retail sales. An "active" supervisor earns a 5 percent bonus on all sales to his active first generation supervisors. A supervisor is also eligible to earn 5 percent of the volume bonus on all sales to second, third, fourth, and fifth generation supervisors, provided that the supervisor has an equal number of active first generation supervisors in any given month. A director, the highest level participant, purchases products directly from APMI at 30 percent off the suggested retail price and either retails the product or wholesales it to personal representatives. Directors earn bonuses worth 5 percent of a bonus volume based on purchases by their first five active generations of either

supervisors or directors. Also, a director is eligible to earn production profit sharing based upon personal organization sales in relation to national sales.

The overall issue in this case is whether these marketing plans are illegal as "unlawful practices" pursuant to Iowa Code section 714.16(2)(b) (1983), which states:

The advertisement for sale, lease or rent, or the actual sale, lease, or rent of any merchandise at a price or with a rebate or payment or other consideration to the purchaser which is contingent upon the procurement of prospective customers provided by the purchaser, or the procurement of sales, leases, or rentals to persons suggested by the purchaser, is declared to be an unlawful practice rendering any obligation incurred by the buyer in connection therewith, completely void and a nullity. The rights and obligations of any contract relating to such contingent price, rebate, or payment shall be interdependent and inseverable from the rights and obligations relating to the sale, lease, or rental.

In *State ex rel. Turner v. Koskot Interplanetary, Inc.*, 191 N.W.2d 624, 630–32 (Iowa 1971), we interpreted this subsection[6] to make per se illegal "referral" or "pyramid" sales arrangements by which people are induced to buy upon the representation that they can reduce or recover their purchase price, or earn untold profits, by referring buying prospects to the seller. We stated that the specific legislative purpose "was to, among other things, brand all pyramiding referral merchandise sales schemes as a cancerous vice against which the public should be protected and for that reason suppressed." *Id.* at 632. Although the terms "pyramid" and "referral" are neither mentioned nor defined in the statute, such terms describe the conduct prohibited. Consequently, we examine the

---

**3.** The original plan had a position of "manager" designated between personal representative and supervisor. This manager level was eliminated in the current plan.

**4.** Based on the report of Mr. Max.

**5.** The discounts on the purchase price varied slightly between this plan and the original plan.

**6.** That action was brought in 1970 when present section 714.16(2)(b) was located at Iowa Code section 713.24(2)(b) (1966).

plans in question to ascertain whether they are pyramid or referral sales arrangements, or otherwise invalid under section 714.16(2)(b).

I. *Pyramid plans.* The parties stipulated to a definition as follows:

*"Pyramid selling"* as defined by the Federal Trade Commission involves "inventory loading" and "head hunting fees". Companies which engage in pyramid selling have a large inventory requirement for a new distributor and reward distributors for bringing into the business a new distributor, unrelated to the sale of product. The result emphasizes recruiting of new distributors rather than selling the products to consumers. Typically, these companies require new recruits to buy $2,000 to $5,000 in inventory with as much as half of that amount going to the recruiting distributor. Such schemes are often characterized by the payment by participants of money to the company in return for which they receive (a) the right to sell the product *and* (b) the right to receive, in return for recruiting other participants into the program, rewards which are unrelated to the sale of the product to ultimate users.

We add that the Federal Trade Commission took this view of subsection (b) when it stated:

As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are found to be disappointed.

*In re Koscot Interplanetary, Inc.,* 86 F.T.C. 1106, 1180 (1975), *aff'd mem., sub. nom. Turner v. F.T.C.,* 580 F.2d 701 (D.C. Cir.1978).

■ Initially, we do not believe that the State has shown that, on their face, these plans are pyramid distribution plans. The marketing plans in question are not in character with a pyramid "which is a scheme whereby what is sold is really the right to sell (another like franchise to sell) and the product is de-emphasized." *Commonwealth v. Tolleson,* 14 Pa.Cmwlth. 72, 321 A.2d 664, 692 (1974). We note that there is no "head hunting" fee paid to supervisors and directors who get personal representatives to enter the program. Participants do not pay large sums of money to enter the program; there is only a $38 entry fee, paid directly to the company, of which supervisors and directors receive no part. Although a supervisor or director obtains a commission by wholesaling to personal representatives and earns bonuses based on their output, these remunerations are directly related to products that are either consumed by the personal representatives or retailed to their customers. Furthermore, there is no inventory loading on personal representatives because there is a two case purchasing limit on those participants along with a requirement that 75 percent of their two cases be sold before further orders are accepted. The product may be returned for a refund if the cases are still sealed. Consequently, on their face, these plans contain no head hunting fees, large entry fees or inventory loading which are normally found in pyramid sales plans. *See State ex rel. Edmisten v. Challenge, Inc.,* 54 N.C.App. 513, 284 S.E.2d 333, 337–38 (1981).

We also note that the State has offered no evidence to show that the operative plans are pyramid sales schemes. On the other hand, we have the opinion of defendants' expert who researched APMI's direct selling plans and indicated that they are not pyramid distribution plans because:

(a) It has a professional management staff available to train and motivate distributors. Distributors are not charged for this service, nor are they required to take advantage of it.

(b) A new product representative does not pay for the right to sell; he pays only $30 for a sales kit, which includes two bottles of product and related literature (product information and sales aids).

(c) A product representative *cannot* sponsor (i.e., recruit) others. Hence, he does not buy the right to recruit, unrelated to selling product to ultimate users or consuming the product personally.

The expert then noted that the plans did not contain inventory loading or position buying, and concluded that these plans lead to retail selling.

We conclude that the State has not established that APMI's plans are pyramid distribution plans.

II. *Referral sales.* The State urges that the marketing plans in question are clearly referral sales programs that are prohibited by section 714.16(2)(b). Although in *Turner* we used the terms pyramid and referral sales interchangeably, we stated that this section "served, in effect, to per se make illegal any use of what is known as referral sales programs." 191 N.W.2d at 627. However, neither the statute nor our case law provides a specific definition of a referral sales program.

Generally, the purchaser in a referral sales program is induced upon the representation that his purchase price will be reduced or that he will receive a commission for referring other prospects for similar sales to the seller. *See* 14 A.L.R.3d 1420, 1420 and n. 1 (1967). After equating referral sales plans to chain letters, one court described the operation of a referral sales plan as follows:

> In a referral sales scheme, the price of a product is inflated beyond its competitive market price so as to make room for another item of cost, mainly the referral fee of the seller. The prospective purchaser is induced to purchase by a promise that for every additional sale which he procures, he receives a commission. A participant in a referral sales scheme is told that he can quickly recoup his investment and then easily make additional money.... Referral sales schemes are inherently fraudulent because there is no infinite number of purchasers for any particular product or service.

*Tolleson,* 321 A.2d at 691.

It is apparent that the sales plans in question are not in the character of a traditional referral sales program. The purchaser does not supply names of prospects in the hope that the seller will make additional sales and give a commission or rebate to the original purchaser. Additionally, the State has presented no evidence that the price of the fuel additive is inflated beyond its competitive market price to accommodate for a referral fee. Therefore, we examine these plans to ascertain whether they bear some of the same evils of a referral sales plan and consequently violate the statute.

The State asserts that the primary evil of a multilevel referral sales program is that it is inherently a fraud because of the geometric rate of growth that must occur for each new level of participants to succeed and the inevitability of market saturation. The State then argues:

> Any scheme that contains economic incentives for the recruitment of new participants has the potential to be a massive fraud on the public. There is simply no legitimate function performed by a company that is built on making money through the geometric growth of a sales force.
>
> ....
>
> ... Without a complete ban [of these types of schemes], the State would be put to the burden of conducting massive investigations and proving difficult factual issues on whether the scheme is good or bad—all while the scheme proliferates. The Iowa legislature has not placed such a burden on the State but rather completely proscribed referral selling in an effort to combat the problem.

Finally, the State asserts that any marketing plan that provides the purchaser of the product an economic incentive for the recruitment of new participants is illegal as a matter of law pursuant to section 714.-16(2)(b).

■ Under section 714.16(2)(b), a sale of merchandise in which the purchaser gains an economic benefit contingent upon the procurement of prospective customers provided by the purchaser is deemed an unlawful practice. The statute broadly prohibits a seller from promising the purchaser consideration for the purchaser providing names of potential customers. Should section 714.16(2)(b) be interpreted to per se ban all marketing programs that provide the purchaser any incentive for the recruitment of new participants? We do not believe so.

Initially, we examine the product purchasers in APMI's plans. Some are the ultimate consumers who are not promised incentives to refer other purchasers. Others are personal representatives who purchase the fuel additive from their sponsor, either a supervisor or director. Under the plans, personal representatives cannot sponsor new participants and receive no consideration for referring new personal representatives to their supervisor or director. Rather, they simply receive a commission when they retail the product. The remaining purchasers are supervisors and directors.

The State argues that these higher-level participants, the supervisors and directors, receive bonuses and discounts based on recruiting new personal representatives. In this manner the State claims that APMI is advancing a price or payment to purchasers contingent on referring new customers which, it asserts, is per se illegal under section 714.16(2)(b).

We disagree with the State's expansive interpretation of the statute. We believe that in enacting section 714.16(2)(b) the legislature intended to prevent the deception present in pyramid plans and referral sales programs, namely, profits or rebates derived primarily from the recruitment of new participants that is unrelated to retailing the product. Such plans serve no legitimate economic purpose and ultimately recruits either lose their investments or are stuck with unwanted merchandise.

■ In the present case, supervisors and directors who purchase the fuel additive can either consume, retail, or wholesale the product. By sponsoring personal representatives, supervisors and directors can obtain profits by wholesaling to these representatives and receiving bonuses based on their sales output. But, is this consideration based primarily on recruiting new participants that is unrelated to selling the product? Or are these profits and bonuses primarily based on retailing the fuel additive?

The mechanics of APMI's plans are very similar to those present in Amway's marketing program. The Federal Trade Commission challenged Amway's program as being, among other things, "inherently deceptive, as it holds out the promise of 'substantial income ... as a result of ... sales activities from ... endless chain recruiting activities.'" *In re Amway Corp.* 93 F.T.C. 618, 714 (1979). Under the Amway Plan, a sponsoring distributor receives nothing for the mere act of sponsoring. Only when the newly recruited distributor sells to consumers does the sponsor begin to earn money from his recruiting efforts. Amway has a rule in which a sponsoring distributor buys back merchandise from his distributors who leave the program. A "70 percent rule" provides that distributors must sell at least 70 percent of the products they buy during any given month. Another Amway rule requires that a sponsoring distributor make sales to ten different customers a month in order to earn a performance bonus. The commission concluded that:

> [t]he buy-back rule, the 70 percent rule, and the ten customer rule are enforced, and that they serve to prevent inventory loading and encourage retailing.... Given these facts, ... the Amway Plan is not a plan where participants purchase the right to earn profits by recruiting other participants, who themselves are interested in recruitment fees rather than the sale of products.

*Amway*, 93 F.T.C. at 716–17.

In the present case, APMI's marketing plans contain a buy-back rule, a 75 percent

rule for personal representatives, and retail sales report requirements. A person is not required to pay a head hunting fee or buy a large amount of inventory to become an APMI personal representative. Additionally, we have Mr. Max's report in which he concluded that "there is no remuneration in the company's plan other than that which is related to product movement." On the other hand, the State primarily relies on the inevitability of market saturation and the possible geometric growth of APMI's sales force. The State has presented no other evidence and offered little analysis showing that APMI's marketing plans yield profits to sponsors that are based primarily on recruitment that is unrelated to the sale of the product. *See Ger-Ro-Mar, Inc. v. F.T.C.,* 518 F.2d 33, 37–38 (2nd Cir.1975). The State has not shown that APMI's rules which prevent inventory loading and encourage retailing are not enforced by the company. Therefore, we conclude that the State has failed to prove that APMI's marketing plans are an unlawful practice under section 714.16(2)(b).

In conclusion, we do not accept the State's contention that section 714.16(2)(b) should be interpreted to per se ban all multilevel marketing plans that offer incentives for the recruitment of sales personnel. Rather, we believe that each case should be examined upon its own merits. On its face, a marketing program may show that its primary feature is the recruitment of salespersons unrelated to selling the product. Those plans may indeed be illegal as a matter of law. In other instances, however, evidence must be presented that the primary effect of the marketing program is the recruitment of persons that is unrelated to retailing the product before the plan can be deemed an unlawful practice under section 714.-16(2)(b).

In this case the State has neither shown that the plans are illegal on their face nor presented evidence to prove that the plans are illegal in fact. The trial court was incorrect as a matter of law in holding that the marketing plans are in violation of section 714.16(2)(b).

REVERSED.

All Justices concur except LAVORATO, J., who takes no part.