STATE of Iowa, ex rel. Thomas J. MILLER, Attorney General of Iowa, and Craig A. Goettsch, Superintendent of Securities, Iowa Division of Insurance, Appellees/Cross–Appellants,

v.

SANTA ROSA SALES AND MARKETING, INC., A California Corporation, and Charles R. Groeschel, In His Individual Capacity as President and Director of Santa Rosa Sales and Marketing, Inc., Appellants/Cross–Appellees.

No. 90–663.

Supreme Court of Iowa.

Sept. 18, 1991.

James L. Krambeck, David H. Luginbill, and Michael J. Eason of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellants.

Bonnie J. Campbell, Atty. Gen., and Steven St. Clair, Asst. Atty. Gen., for appellees.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, LAVORATO and NEUMAN, JJ.

SCHULTZ, Justice.

This appeal arises out of a controversy over the legality of a marketing program conducted in Iowa by Santa Rosa Sales and Marketing, Inc. (Santa Rosa). The State of Iowa, through the Attorney General and Superintendent of Securities (State), filed a petition in equity alleging that defendants, Santa Rosa and its president, Charles R. Groeschel, had violated the Iowa Consumer Fraud Act, Iowa Code section 714.16,[1] and the Iowa Uniform Securities Act, Iowa Code chapter 502. On May 31, 1989, the State obtained a temporary injunction enjoining Santa Rosa from selling its products in Iowa. After trial, the district court ruled that Santa Rosa's marketing program violated several consumer protection statutes and ordered that defendants be permanently enjoined from committing these violations. We affirm portions of the district court's ruling and reverse other parts.

---

1. All statutory references are to the 1989 Iowa Code.

We review this equity case de novo and find the facts anew. Santa Rosa is a California corporation engaged in marketing contracts for Silver Eagle coins (coins), recreational vehicle (RV) park memberships, and motor vehicles. Santa Rosa was marketing its products throughout most of the United States at the time of trial. It marketed to Iowans from late November 1988 until the injunction was issued in May 1989. In Iowa, 570 persons purchased contracts from Santa Rosa. The majority of these contracts purchased were for Silver Eagle coins.

The coins sold by Santa Rosa are United States currency with a face value of one dollar. The primary value of these coins lies in their silver content which is .999 Troy ounce. Coins could be purchased in sets of three for $80 or twenty for $500 in the form of a contract. Thus, Santa Rosa sold these coins for approximately $26.66 each. These coins are also available for purchase nationwide from various companies, coin shops, banks, cable TV, and the National Minting Distribution Center, Inc., for prices ranging from $6 to $65 per coin. However, two coin experts testified that the retail value of a coin was $8.50.

Charles R. Groeschel is founder, chairman of the board, and former president of Santa Rosa. He is the person most responsible for developing the Santa Rosa marketing concept and implementing its policies and procedures. Groeschel and his wife are the sole shareholders of Santa Rosa.

Santa Rosa's sales are made by brokers or salespersons who sell contracts. Purchasers of Santa Rosa contracts may become brokers or salespersons, however, neither brokers nor salespersons are required to be previous purchasers of Santa Rosa contracts. No training is required to become a salesperson. A salesperson's responsibilities include identifying, contacting, and bringing prospective clients to presentations given by Santa Rosa brokers.

Unlike salespersons, brokers receive training and ongoing continuing education from Santa Rosa. Brokers also enter a written contract with Santa Rosa which requires them to comply with Santa Rosa's written policies and guidelines. Brokers make presentations regarding coins and the Santa Rosa program to prospective purchasers, supervise salespersons, and complete necessary paperwork.

Broker presentations are usually made at the home of either a previous or prospective purchaser, or at some public meeting place. The content of broker presentations are prescribed by Santa Rosa's training materials. Prospective purchasers are invited to broker presentations by salespersons. After the broker completes a presentation, prospective clients are given the opportunity to buy coins or sign up to be a salesperson.

During the period when Santa Rosa marketed in Iowa, a typical purchase of a Santa Rosa coin contract operated as follows. Initially, first-time purchasers bought one or more "starter contracts" at a cost of either $80.00 or $500.00. Purchasers of coin contracts were given the opportunity to become salespersons and earn payouts [2] from Santa Rosa by arranging for prospective purchasers to attend broker presentations. The purchase agreement contained a provision requiring twelve completed sales of coin contracts before Santa Rosa would make payouts to salespersons. If the twelve required sales were completed, Santa Rosa's literature states that salespersons "will be paid a net sales commission of $120.00 in Silver Eagle coins for the Direct Sales of twelve $80 Purchase Orders [or] a net sales commission of $1,500 in Silver Eagle coins for the Direct Sales of twelve $500 Purchase Orders." If salespersons did not achieve twelve completed sales of coin contracts within thirty days, then they were "removed from the referral program" and the initial $80.00 or $500.00 payment became an outright purchase of the number of coins under the contract.

Purchasers of Santa Rosa coin contracts were given the option to never take possession of the coins initially purchased or earned by the completion of twelve sales.

---

2. Pay-outs are also referred to as "referral fees" and "commissions" in Santa Rosa's documents.

Theoretically, Santa Rosa buys back the coins which purchasers never receive, resells them, and sends purchasers cash. Of the 570 Iowans who purchased contracts from Santa Rosa, 485 or 85% opted not to take possession of the coins. Thus, we find that Santa Rosa's primary emphasis was on the potential money-making opportunities that salespersons could earn from Santa Rosa payouts by luring prospects to attend broker presentations rather than on the sale of coins.[3]

Defendants argued at the February 1990 trial that Santa Rosa's marketing program is simply an attempt to sell a product—coins—to people interested in buying them. The trial court rejected this contention. Specifically, it ruled that the program violated Iowa's consumer fraud statute, Iowa Code section 714.16, by committing the following unlawful practices: (1) referral sales in violation of section 714.16(2)(b); (2) misrepresentations in violation of section 714.16(2)(a); (3) violation of the Door-to-Door Sales Act, Iowa Code chapter 82; and (4) violation of the lottery statute, Iowa Code section 725.12. The court enjoined defendants' marketing program in Iowa. It further ruled that defendants were jointly and severally liable for payment of $196,463.00 to the State to provide a restitution fund for Iowa consumers who made purchases from Santa Rosa. In addition, the court assessed a $40,000 civil penalty, attorney fees, and court costs against defendants. It ordered the State to make restitution to consumers from the restitution fund and deposit any remainder in the State of Iowa's Consumer Education and Litigation Fund. In a posttrial ruling, the court added an award of prejudgment interest.

Defendants appeal from the trial court's ruling and contend that: (1) Santa Rosa's marketing program is not an illegal referral sales plan; (2) Santa Rosa did not make misrepresentations about the program; (3)

any violation of the Door-to-Door Sales Act or Iowa lottery statute is not subject to judicial enforcement; (4) the undistributed portion of the consumer restitution fund may not be awarded to the State of Iowa; (5) the civil penalty imposed against them is unwarranted; (6) prejudgment interest cannot be assessed on the restitution award; and (7) Groeschel is not personally liable. The State's cross-appeal challenged the standard of proof, raised two further violations, and claimed that multiple civil penalties should be levied. Defendants challenge appellate jurisdiction of the State's cross-appeal.

I. *Jurisdictional issues.* We are initially confronted with the issues of the prematurity of defendants' appeal and the timeliness of the State's cross-appeal. Vital to the resolution of these issues is the timeliness of a posttrial motion.

An appeal must be taken within thirty days from the entry of either a final judgment or a ruling on certain posttrial motions. Iowa R.App.P. 5(a). These posttrial motions must be filed within ten days after the court's entry of a judgment unless the court grants additional time. *See* Iowa R.Civ.P. 179(b), 247. In this case, the State filed a rule 179(b) motion on April 13, seventeen days after the court entered its judgment. The State claims that because its rule 179(b) motion requested an extension of time and the trial court sustained that request on May 9, the motion was not late. The State also urges that defendants waived their objection to the State's failure to file its motion within the ten-day time period.

We first examine the propriety of the order extending the ten-day time requirement for filing a rule 179(b) motion. The State filed the motion seven days after the ten-day time period requirement had expired. We have uniformly held that a motion for extension of time must be filed before the expiration of the time period for

---

**3.** Defendants claim that they made revisions to Santa Rosa's business forms "to clarify the terms of the agreements and nature of the transaction." Defendants emphasize a disclaimer form which was introduced to eliminate confusion by disclosing the terms of the purchase agreement with Santa Rosa in more detail. However, we find that the record reveals that the new disclaimer form was signed by only two Iowa consumers. One was signed shortly before and the other after the May 31, 1989, injunction was issued.

filing the motion sought to be extended. *Street v. Stewart*, 226 Iowa 960, 967, 285 N.W. 204, 207 (1939); *In re Estate of Larimer*, 225 Iowa 1067, 1071, 283 N.W. 430, 433 (1939); *White v. Guarantee Abstract Co.*, 96 Iowa 343, 344–45, 65 N.W. 305, 306 (1895). Consequently, we conclude that the trial court erred by extending the time period for filing a rule 179(b) motion to enlarge the court's findings.

We now turn to the State's claim that defendants waived their objection to the untimeliness of the State's rule 179(b) motion. The timeliness of posttrial motions and appeal is a matter of jurisdiction and is not subject to waiver in Iowa. *Hogan v. Chesterman*, 279 N.W.2d 12, 13–15 (Iowa 1979). We stated: "[I]t is now well established that any equities which might arise among the litigants from their agreements must yield to the court's clear duty to press for a conclusion of litigation." *Id.* at 13. Thus, we reject the State's waiver claim.

Our rejection of the State's extension of time and waiver arguments provides an answer to the question of whether the appeal was early or the cross-appeal was late. An untimely rule 179(b) motion does not toll the thirty-day time period to appeal. *Doland v. Boone County*, 376 N.W.2d 870, 876 (Iowa 1985); *Hogan*, 279 N.W.2d at 13–15. Consequently, defendants' appeal, filed on April 26, was within the thirty-day time period and was not premature. Thus, we overrule the State's motion to dismiss defendants' appeal.

This determination affects the State's cross-appeal. A cross-appeal must be filed within the thirty days for taking an appeal or within five days after the appeal is taken. Iowa R.App.P. 5(a). The State's cross-appeal, filed June 8, did not meet either deadline imposed by this rule and does not provide us jurisdiction to consider the State's cross-appeal.

The State also asked us to construe its motion to dismiss defendants' appeal, filed on May 1, as a cross-appeal. In this motion, the State asked this court to rule that the State could file a notice of cross-appeal within thirty days of the trial court's ruling on its pending rule 179(b) motion. Our rules do not provide for an extension of time to file either an appeal or cross-appeal. *See Uchtorff v. Dahlin*, 363 N.W.2d 264, 267 (Iowa 1985). Furthermore, the State's motion to dismiss does not purport to be an appeal nor does it comply with the notice requirements of Iowa Rule of Appellate Procedure 6(a). Accordingly, we must deny this alternate request.

In summary, we reject the State's contentions that the trial court extended the time period for filing a rule 179(b) motion and that defendants waived the time period. The State's untimely notice of cross-appeal does not provide us jurisdiction. Thus, we dismiss the State's cross-appeal.

II. *Violation of referral sales prohibition in Iowa Code section 714.16(2)(b).* The trial court ruled that Santa Rosa violated the prohibition against "referral sales" prohibited by Iowa Code section 714.16(2)(b) as follows:

> The advertisement for sale, lease or rent, or the actual sale, lease, or rental of any merchandise at a price or with a rebate or payment or other consideration to the purchaser which is contingent upon the procurement of prospective customers provided by the purchaser, or the procurement of sales, leases, or rentals to persons suggested by the purchaser, is declared to be an unlawful practice rendering any obligation incurred by the buyer in connection therewith, completely void and a nullity. The rights and obligations of any contract relating to such contingent price, rebate, or payment shall be interdependent and inseverable from the rights and obligations relating to the sale, lease or rental.

The statutory language does not contain the word "referral," however, we have interpreted section 714.16(2)(b) as prohibiting "referral sales." *State ex rel. Turner v. Koscot Interplanetary, Inc.*, 191 N.W.2d 624, 630 (Iowa 1971). We elaborated on the definition "referral sales" as follows:

> Generally, the purchaser in a referral sales program is induced upon the repre-

sentation that his purchase price will be reduced or that he will receive a commission for referring other prospects for similar sales to the seller.

*State ex rel. Miller v. American Professional Mktg., Inc.*, 382 N.W.2d 117, 121 (Iowa 1986).

Santa Rosa maintains that its program is not an illegal referral sales plan because a salesperson's compensation is directly related to the sale of coins and not to the recruitment of additional salespersons. In *American Professional,* we stated that section 714.16(2)(b) is not a per se ban on marketing programs that provide purchasers an incentive to recruit new participants. *Id.* at 122. The legislature intended to prevent deception present in referral sale programs, specifically, profits or rebates derived primarily from the recruitment of new participants that is unrelated to retailing the product. *Id.*

■ To prevail, the State must prove illegality by a preponderance of clear, convincing, and satisfactory evidence. *State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 619 (Iowa 1989). In our de novo review of the evidence, we believe that the State has met this burden. The trial court commented on Santa Rosa's operation as follows:

Consumer testimony, coupled with the data showing that only a fraction of Iowa purchasers opted to take Silver Eagle coins, clearly establish that Iowa purchasers were motivated by something other than the desire to own Santa Rosa's Silver Eagle coins. The true motivation was the desire to make a lot of money with relative ease by recruiting others who share that desire.

Santa Rosa's own emphasis in presenting its program was on earning money by generating referrals rather than on the products. Broker training materials, sales documents and the actual presentations of brokers show the importance of making money by providing referrals, and the relative unimportance of Santa Rosa's Silver Eagle coins and other products.

Our review of the record causes us to agree with the trial court.

Defendants argue that a person may become a Santa Rosa salesperson without making a purchase. We agree with the trial court's assessment of this argument as follows:

Although a clause in Santa Rosa's purchase agreement states that "[t]here is no requirement to purchase Silver Eagles in order to earn the referral fee," Santa Rosa clients uniformly testified that they were led to believe that they had to make a purchase in order to receive money from Santa Rosa. Broker presentations failed to mention any supposed option to earn without first buying, and broker training materials were silent on the subject as well. Santa Rosa's sales documents were designed for *clients* who also wished to strive for Santa Rosa payouts, and not one of the many Santa Rosa forms and sales documents is tailored to the situation of the non-purchaser who wishes to earn referral fees. Although Santa Rosa identified six *brokers* who supposedly earned broker's commissions without having first made purchases, no Iowan other than a broker was ever identified as having earned money from Santa Rosa without making a purchase. Thus, there appears to have been a *de facto* understanding that a person was required to buy Santa Rosa contracts before earning referral fees.

In summary, we find that Santa Rosa clients were purchasing the opportunity to participate in a grand money-making scheme rather than coins. Santa Rosa's training material states as follows: "It is the company's objective to present an opportunity and teach people how to take advantage of it.... [W]e can, together, help the *masses* achieve financial freedom." We conclude that this type of money-making objective is the type of referral sales that the legislature intended to prohibit. Thus, we affirm the trial court's ruling that defendants violated Iowa Code section 714.16(2)(b).

■ III. *Misrepresentation under Iowa Code section 714.16(2)(a).* The trial

court ruled that Santa Rosa's sales presentations and training materials consistently involved deception and misrepresentation in violation of section 714.16(2)(a) which provides:

> The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise, whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.

The trial court found that Santa Rosa misrepresented the potential earnings and legality of its marketing program.

A. *Earnings.* Various Iowa purchasers testified that Santa Rosa brokers claimed that specific dollar amounts could be made within a certain time period. For instance, one recurrent claim that was made during various broker presentations was that $25,000 could be earned within periods of time ranging from eight to nine weeks to one year from the date a Santa Rosa contract was purchased. Also, one purchaser testified that a broker claimed that $54,000 could be made in one year as the final stage in Santa Rosa's program.

Iowa purchasers testified that attaining such payouts from Santa Rosa was portrayed as an easy task and most did not understand the prerequisites of receiving payouts. For instance, if only eleven sales were made, Santa Rosa made no payouts. However, many purchasers who testified did not understand that the completion of twelve sales was required before any payouts would be made to them. Instead, Iowa purchasers came away from broker presentations with the understanding that payouts would be received even if they were unable to make three sales which in turn generated three more sales. One purchaser quoted a Santa Rosa broker as assuring her that "[n]o matter what, we would get our money back [payout from Santa Rosa]." Furthermore, various Santa

Rosa promotional forms distributed to prospective purchasers at broker presentations contained the statement "It's that QUICK, and it's that EASY!"

Defendants admit that certain Santa Rosa brokers made misrepresentations during presentations to Iowans regarding earnings under the Santa Rosa program. However, defendants argue that they are not responsible because it was "renegade brokers," not Santa Rosa, who made the misrepresentations. We find no merit in this contention for two reasons.

First, promises of quick and easy earnings can be traced to broker training materials and defendant Groeschel's broker training tape which were both in use prior to the May 1989 injunction. For instance, Groeschel tells brokers in a training tape that all a Santa Rosa purchaser needs to do is purchase a contract and give a broker three referrals—"three people who want to make money ... [a]nd that client will become very, very, very wealthy. That's all he has to do." In this tape, Groeschel also gives an example of how to explain to a prospective purchaser that it is possible to make $100,000 in less than a year. In addition, Groeschel tells brokers that each broker can become a Santa Rosa national director with a minimum weekly income of $169,000 if they follow instructions.

Second, defendants failed to implement a system of monitoring new brokers and the training they received prior to giving presentations and making sales to Iowans. Santa Rosa's training manual states that brokers must "comply with all rules, regulations, policies and procedures contained in this Manual." Brokers are expected to follow established procedures, a prescribed format for presentations, and use only authorized, preprinted Santa Rosa forms. If brokers must comply with Santa Rosa's requirements, it seems that Santa Rosa must provide its new brokers with training manuals and individualized instruction, and monitor their activities on an ongoing basis.

For example, one Iowa broker began making presentations and sales without attending an actual broker presentation. He

was not provided with any written training manuals or materials until several months after he had begun making presentations and sales. However, Santa Rosa freely accepted all sales in Iowa made by this broker. Santa Rosa also accepted sales made by other brokers who, as noted previously, defendants admit made false statements and misrepresentations. Since we find that these misrepresentations can be traced to Santa Rosa, we conclude that Santa Rosa cannot disclaim responsibility for the admitted misrepresentations that its brokers made to Iowans.

B. *Legality.* Several brokers told purchasers that Santa Rosa's program was legal. Some specifically claimed that the Iowa Attorney General's office had approved Santa Rosa's program. One broker claimed that Santa Rosa's program was "legal in all 50 [states]." Defendants do not deny that brokers made misrepresentations of the program's legality, but again claim that they are not responsible for misrepresentations made by renegade brokers. We find no merit in this defense.

Santa Rosa's broker training materials instruct and reassure brokers that Santa Rosa's program is a "perfectly legal" opportunity. In a document entitled "Questions Most Frequently Asked About The Santa Rosa Plan," the first question on this document is "1. Q. Is this plan legal? A. Yes!" The answer further asserts that "[a]ll of our Purchase Order Forms, Contracts and Agreements have been carefully scrutinized and put to the test by competent *legal counsel in all the states* in which we are presently operating...." (emphasis added). In a broker training tape, Groeschel instructs brokers that it is perfectly legal "to pay a commission for a referral" and discusses how to respond to those who are cynical and ask questions about the legality of Santa Rosa's program.

The foregoing facts reveal that Santa Rosa made repeated assurances and claims of legality to Iowa brokers. However, Santa Rosa did not obtain a legal determination of whether its program complied with Iowa law before making these assurances

of legality. The record reveals that Santa Rosa did not attempt to determine whether its program was in compliance with Iowa law until March 1989, when it contacted an Omaha attorney who then contacted the Iowa Attorney General's office. This was four months after Santa Rosa sales began in Iowa.

Defendants seek to disclaim responsibility for any of the broker misrepresentations by emphasizing a paragraph in the training manual which states that "[a]ll brokers shall comply with all federal and state statutes and regulations and local ordinances and regulations concerning the operation of their businesses." Our review of the record reveals no evidence that Santa Rosa ever contacted or monitored brokers' activities to ensure that brokers had contacted local government offices or determined the appropriate state's legal requirements. Furthermore, the idea that Santa Rosa's program is "perfectly legal" was vigorously espoused in broker training materials. Thus, we similarly conclude that misrepresentations of legality can be traced to Santa Rosa. We find by clear, convincing, and satisfactory evidence that defendants also violated section 714.16(2)(a).

C. *Summary.* The record includes testimony of persons who attended presentations given by nine different Santa Rosa brokers. Descriptions of these presentations given by various persons who attended reveal that different brokers consistently made similar misrepresentations about the dollar amount of payouts that could be earned from Santa Rosa, the ease with which these payouts could be earned, and the legality of Santa Rosa's marketing program. The record also supports a finding that these broker misrepresentations can be attributed to information provided in Santa Rosa's written training materials, Groeschel's oral statements, videotapes, and the lack of monitoring new brokers' activities. Therefore, we hold that defendants cannot avoid responsibility for misrepresentations made by its brokers. Consequently, we affirm the trial court's ruling that defendants violated Iowa Code sections 714.16(2)(a) and (b).

■ IV. *Violation of Door-to-Door Sales Act and lottery statute.* The State alleges that defendants violated the Door-to-Door Sales Act (Act) in Iowa Code chapter 82 and the prohibition against private lotteries in Iowa Code section 725.12. The trial court found that defendants committed such violations and that "[s]uch a pattern of violations ... is properly deemed an unfair practice for purposes of section 714.16 enforcement." The Act and lottery statute both have self-contained enforcement mechanisms. Iowa Code chapter 82 provides that a violation of the Act is a simple misdemeanor and permits such a violation to serve as a defense to an action on contract. Iowa Code §§ 82.5–.6. Similarly, section 725.12 provides that violation of the lottery statute is a serious misdemeanor. Neither the Act nor lottery statute contains express language giving the attorney general power to enforce its provisions pursuant to section 714.16, the consumer fraud statute.

The issue is whether violations of the Act or lottery statute fit within the meaning of the term "unfair practice" as defined in the consumer fraud statute. The term "unfair practice" is defined as "an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code § 714.16(1)(f). By using this language, the legislature did not specify that violations of chapter 82 or the lottery statute should be deemed an "unfair practice." Neither do we believe that we can construe the legislature's definition of "unfair practice" to include these two misdemeanors by implication.

■ Three reasons support our conclusion. First, legislative intent is expressed by omission as well as by inclusion. *Barnes v. Iowa Dep't of Transp.*, 385 N.W.2d 260, 263 (Iowa 1986). "The express mention of certain conditions of entitlement implies the exclusion of others." *Id.* The legislature expressly stated those violations of other Code sections which should be deemed a violation of section 714.16(2)(a). *See, e.g.,* Iowa Code § 714.-16(2)(f) (stating that violation of Iowa Code sections 535C.1–535C.10, loan broker regulations, are unlawful practices). The legislature's failure to include violations of the Act or lottery statute as unfair practices reveals an intent to exclude them. Second, violations of the Act or lottery statute are not the same type of acts of "deception, fraud, false pretense, false promise, or misrepresentation" that section 714.16(2)(a) was designed to prevent. The Act provides buyers' remedies from sales obtained by pressure; the lottery statute provides remedies for schemes involving gambling. Both provisions protect consumers. However, unlike section 714.16, the thrust of these provisions is not directed at the prevention of fraud. Third, the Act and the lottery statute both have self-contained prescribed penalties. We believe that the legislature would have been more explicit if it had intended to provide a second cause of action for offenses of either the Act or lottery statute.

Based on these reasons, we conclude that the Act and lottery statute are self-contained statutes that have independent enforcement mechanisms. Therefore, we conclude that it is improper to incorporate violations of either chapter 82 or section 725.12 into section 714.16 for purposes of enforcement by the attorney general. Consequently, we reverse the trial court's holding to the contrary.

The trial court's determination that chapter 82 and section 725.12 violations constitute a consumer fraud violation does not provide a ground for reversal of the case as a whole. The State's showing that defendants violated the prohibition against referral sales and misrepresentation contained in section 714.16 are sufficient to invoke statutory penalties.

■ V. *Distribution of unclaimed portion of consumer education and litigation fund.* The trial court ordered defendants to pay the State $196,463.00 to serve as a restitution fund to reimburse Iowa residents who made purchases from Santa Rosa. The court further ordered that "if funds remain which cannot be distributed such funds shall be deposited in

the Consumer Education and Litigation Fund (consumer fund) maintained by the office of the Iowa Attorney General under the authority of 1989 Iowa Acts, chapter 316, Section 1(6)."

Defendants contend that the trial court exceeded its statutory authority by awarding the undistributed portion of the restitution fund to the consumer fund. The State counters that 1989 Iowa Acts, chapter 316, section 1(6) gives authority for the trial court's distribution to the consumer fund.

Iowa Code section 714.16(7) clearly grants the court authority to order restitution as follows:

> The court may make orders or judgments ... which are necessary to restore to any person in interest any moneys or property, real or personal, which have been acquired by means of a practice declared to be unlawful by this section....

This statutory language authorizes the attorney general to recover restitution for Iowa consumers. However, there is no language in section 714.16 which gives authority to award unclaimed restitution funds to the State.

Chapter 316 was described as an act "relating to and making appropriations to the justice system." 1989 Iowa Acts, ch. 316. Subsection 1(6) of this chapter appropriated $50,000 from the general fund of the State to the Department of Justice to be used as follows:

> for public education relating to consumer fraud and for enforcement of section 714.16. The expenditure of the funds appropriated under this subsection is contingent upon receipt by the general fund of the state of ... damages awarded to the state ... by a civil consumer fraud judgement, if the judgment authorizes the use of the award for public education on consumer fraud.

*Id.* § 1(6). This appropriation measure does not speak to consumer awards. Rather, it specifically addresses the receipt of "*damages awarded to the state* ... by a civil consumer fraud judgment." *Id.* (emphasis added). However, in this case, the restitution fund was an award to Iowa consumers, not to the State.

Thus, we conclude the trial court erred in ordering that an award of the undistributed portion of the restitution fund be deposited in the consumer fund. On remand, the trial court shall order that any undistributed portion of the restitution fund be returned to Santa Rosa.

■ VI. *Civil penalty.* The trial court ordered a civil penalty in the amount of $40,000.00 against defendants pursuant to Iowa Code section 714.16(7). Subsection 7 provides that "the court may impose a civil penalty not to exceed forty thousand dollars per violation against a person found by the court to have engaged in a method, act, or practice declared unlawful under this section...."

Defendants contend, however, that a civil penalty against Santa Rosa is not warranted because Santa Rosa did not authorize or encourage violations of the law and that it was "renegade brokers" who violated the law. As discussed in more detail in division III of this opinion, encouragement came from Santa Rosa's training manuals and tapes, and the inadequate monitoring and supervision of those brokers who made sales in Iowa. *See Briner v. Hyslop*, 337 N.W.2d 858, 867 (Iowa 1983) (holding that principal can be assessed punitive damages for agent's activities if principal was reckless in employing and retaining agent; authorized the doing and manner of agent's acts; and ratified or approved agent's act). Thus, in light of *Briner* and our findings and conclusions in division III, we reject defendants' contention that the civil penalty was not warranted.

We conclude that Santa Rosa impliedly authorized and encouraged the ideas and sales techniques used by the brokers who violated Iowa's consumer fraud statute. Consequently, we hold that the civil penalty imposed upon defendants by the trial court was appropriate.

■ VII. *Personal liability of Groeschel.* The trial court held Groeschel personally liable for the consumer fraud violations. Groeschel urges that the violations were committed by Santa Rosa brokers and that the trial court erred by not applying a

"piercing the corporate veil" analysis as outlined in our case law. We reject this contention. Groeschel's liability arose from his complete control of Santa Rosa and his own personal acts in perpetrating consumer fraud. *See United States v. Cattle King Packing Co.*, 793 F.2d 232, 240 (10th Cir.) (corporate officer in responsible relationship to company activity that violates food laws can be criminally responsible even though corporate officer did not personally engage in act), *cert. denied*, 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986); *State v. Kailua Auto Wreckers, Inc.*, 62 Haw. 222, 230–31, 615 P.2d 730, 737 (1980) (corporate officer who had central role in directing business operations and authorized unlawful acts may be held individually liable for corporate penal law violation); *State v. Placzek*, 380 A.2d 1010, 1015 (Me.1977) (corporate entity does not shield corporate agent from prosecution who knowingly and intentionally causes corporation to commit a crime); *Bourgeois v. Commonwealth*, 217 Va. 268, 274, 227 S.E.2d 714, 718 (1976) (corporate officer cannot avoid penal responsibility for acts done by instrumentality which he employs, directs, and dominates); *Miller v. State*, 732 P.2d 1054, 1059 (Wyo.1987) (corporate entity does not insulate an officer and major shareholder from criminal acts committed for benefit of corporation). Consequently, we affirm the trial court on the issue of Groeschel's personal liability.

VIII. *Prejudgment interest on the restitution award.* The trial court's initial judgment did not order prejudgment interest. Prompted by the State's untimely motion to enlarge, the court added prejudgment interest by a nunc pro tunc order. Defendants challenge that portion of the order which assessed interest of ten percent on the restitution award from the date of the filing of the petition.

Iowa Code section 535.3 provides:

[i]nterest shall be allowed on all money due on judgments and decrees of courts [and] shall accrue from the date of the commencement of the action....

In *State v. Akers*, 435 N.W.2d 332, 334–36 (Iowa 1989), we held that restitution orders in a criminal proceeding mandated by Iowa Code section 910.2 (1987), are not "judgments" or "decrees" under section 535.3. We stated that restitution is a "creature of statute" and that the "imposition of interest on restitution amounts is not proper without explicit statutory authorization." *Id.* at 335. We reasoned that prejudgment interest is not a component of a restitution award. We based our conclusion on the legislature's intention to exclude prejudgment interest by specifying a list of other recoverable expenses within the statutory definition of restitution in Iowa Code section 910.1(4). *Id.* at 334.

In this case, Iowa Code section 714.16(7) permits restitution as a remedy for a consumer fraud violation. Similar to the criminal restitution statute in *Akers*, section 714.16 does not specify prejudgment interest as a component of a restitution award. The trial court apparently acted pursuant to section 714.16(7), which authorizes the court to enter judgments "which are necessary to restore any person in interest any moneys ... which have been acquired by means of a practice declared to be unlawful by this section...." At the time of the judgment, individual amounts recoverable had not been determined and the claimants did not receive personal judgments. Under these circumstances, we decline to infer that this judgment for restitution is a "judgment" or "decree" within the meaning and terms of section 535.3. Thus, we hold that the trial court's award of prejudgment interest on the restitution award was improper.

IX. *Summary.* We hold that the motion to dismiss defendants' appeal is overruled. We agree with defendants' contention that the State's cross-appeal must be dismissed.

We affirm the trial court's holding that defendants violated the prohibition against referral sales and misrepresentations contained in subsection 714.16(2)(a) and (b). We hold that the trial court erred in relying on violations of the Door-to-Door Sales Act and the lottery statute to form the basis of a consumer fraud violation as defined in

section 714.16; however, this holding is not grounds for reversal.

We reverse the portion of the trial court's ruling that provides for awarding the undistributed portion of the restitution fund to the Consumer Education and Litigation Fund and remand to the trial court for an order allowing any excess unclaimed funds to be returned to Santa Rosa. We affirm the civil penalty imposed. We affirm the imposition of personal liability on defendant Groeschel. We reverse the nunc pro tunc order imposing prejudgment interest on the judgment for restitution.

We assess the cost of appeal against the State and defendants in equal shares.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.