STROMBERG HATCHERY, Appellee, v. IOWA EMPLOYMENT SECURITY COMMISSION, Appellant.

No. 47225.

(Reported in 33 N. W. 2d 498)

AUGUST 2, 1948.

1048

F. D. Riley, of Des Moines, for appellant.

Loth & Melton, of Fort Dodge, for appellee.

SMITH, C. J.—The Iowa Employment Security Law proclaims its purpose of "encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment." Section 96.2, Code, 1946.

This "encouragement" is accomplished by establishing a special fund to be administered by the commission (Code section 96.9) and by requiring contributions thereto by the employer "on all taxable wages." Code section 96.7. Benefits to employees are payable from this fund during periods of unemployment. The rules governing such payments and eligibility therefor are worked out in detail but need not be discussed here. See Code section 96.3 et seq.

The question in the instant case is whether plaintiff, as to certain of its employees, is within the terms of the act requiring contribution to this special fund. It operates a poultry hatchery in the city of Fort Dodge. Its twelve or fourteen employees include salesmen, cullers, testers, office clerks, office manager, chick sexer, incubator watcher, incubator operator, and a handy man.

Plaintiff claims all those employees (all admittedly necessary to the conduct and operation of its business, though not all "actually engaged in the manual process of incubating chicks") are within the statutory exclusion of "agricultural labor" from the operation of the act, which defines "agricultural labor" to include "all services performed * * * in connection with the hatching of poultry." Code section 96.19, subsection 7, paragraph g(4).

The defendant, Iowa Employment Security Commission, on the other hand held, and argues here, that "the agricultural exemption refers to services and does not purport to exempt all employees in appellee's [plaintiff's] commercial enterprise";

that is, whether there is coverage depends on the *nature* of the services rendered by the employee and is not governed alone by the fact that the business of the employer is "the hatching of poultry" and that the services are necessary to that business.

The trial court reversed the decision of defendant, Commission, which brings the question to us by appeal.

I. The formal setup of the statute is as follows: Chapter 96 is titled "Employment Security." Section 96.19 is devoted to "definitions" and subsection 7 thereof deals with the term "employment." This subsection has seven divisions lettered from *a* to *g*, inclusive. Subsection 7, paragraph *g* enumerates the services the term "employment" does *not* include and contains numbered paragraphs (1) to (8) inclusive. Paragraph (4) thereof, so far as deemed material here, is as follows:

"(4) Agricultural labor. The term 'agricultural labor', as used in this chapter includes all services performed:

"On a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, *poultry,* and fur-bearing animals and wild life.

"In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm, its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm.

"In connection with the production or harvesting of maple sirup or maple sugar or any commodity defined as an agricultural commodity in section 15(g) of the federal agricultural marketing act, as amended, or in connection with the raising or harvesting of mushrooms, *or in connection with the hatching of poultry,* or in connection with the ginning of cotton, or in connection with the operation or maintenance of ditches, canals, reservoirs or waterways used exclusively for supplying and storing water for farming purposes."

We have italicized the references to *poultry* in the foregoing three unnumbered subparagraphs of paragraph (4). There are three more unnumbered subparagraphs not deemed material here. The purpose of setting out the full text of the first three is to present the language "all services performed * * * *in connection with the hatching of poultry*" in its correct context. It will be observed each subparagraph is separate and relates back to the words "The term 'agricultural labor' * * * includes all services performed."

It should be said at this point that the statutory language quoted above is identical with the corresponding part of the Federal Social Security Act as amended August 10, 1939. See 26 U. S. C. A. section 1426(h), (1), (2), (3). Prior to that amendment the term "agricultural labor" was not defined in that Act. See Historical note, 26 U. S. C. A. 87, section 1426; Birmingham v. Rucker's Imperial Breeding Farm, 8 Cir., Iowa, 152 F. 2d 837, 839. Prior to that time also our own statute contained no such definition. Code, 1939, section 1551.25G; chapter 77, section 1, paragraphs (a), (b) and (c), Acts of the Fiftieth General Assembly. The definition was added to our statute in 1943.

 Considering the sequence in time and the identity of language we must conclude the amendment to our own statute was for the definite purpose of conforming it to the Congressional intent expressed in the Amendment of August 10, 1939, to the Social Security Act. It is of course the intent of our own legislature that controls. But in seeking that intent we have no guidepost except the inevitable assumption that the legislature intended just what Congress intended by the language employed.

Had the language been borrowed from the statutes of a sister state we would go for light to the construing decisions, if any, of that state. Such decisions would not be conclusive on us, especially if not rendered before our legislature adopted the language in question. But even subsequent decisions in the jurisdiction where the legislation originated would be entitled to unusual respect and deference. 50 Am. Jur., Statutes, section 323; 59 C. J., Statutes, sections 627, 628. This is especially true of the statute involved here which was devised by Congress

as a model of uniform social legislation to be adopted by the state legislatures.

■ II. The identical language of the federal statute has been construed by the Circuit Court of Appeals of the Eighth Circuit contrary to the contention of appellant, Commission, here. In Birmingham v. Rucker's Imperial Breeding Farm, 152 F. 2d 837, 840, it was held that services essential to the operation of a hatchery, although not performed in incubation of eggs, constituted "services performed in connection with the hatching of poultry" within the statutory definition of "agricultural labor" in the federal act. That decision affirmed the decision of the United States District Court of the Southern District of Iowa.

The opinion, after referring to departmental rulings to the contrary, says on pages 839 and 840:

"Concededly, Congress was concerned with relieving agriculture of the social security tax burden by including in the term 'agricultural labor' certain services which had been held not to be exempt, but which were considered to be in reality an integral part of farming activities." (Citing records of Congressional proceedings.) "It seems clear that Congress, in defining 'agricultural labor,' used the broad language * * * advisedly and in the realization that the burden of taxes imposed upon hatcheries which procured their eggs from farmers and sold their chicks to farmers would have to be borne by agriculture. If Congress had intended that agriculture should be relieved of this tax burden only to the extent of the taxes upon wages paid to those rendering services in the incubation of eggs, it would, we think, have selected appropriate language to express that intent."

III. This is persuasive reasoning. Adding to it is at the risk of overemphasis. However, we find internal evidence in the language of the statute itself pointing to the same construction. In the first unnumbered subparagraph of paragraph (4) heretofore quoted it is definitely provided that services performed by an employee *on a farm* in connection with raising or harvesting any agricultural commodity, "including the raising * * * feeding, caring for * * * and management of * * *

poultry" is included in the term "agricultural labor." This language expressly covers poultry raising *as a farming operation.*

The subsequent language in the third unnumbered subparagraph, *"in connection with the hatching of poultry,"* is entirely unnecessary therefore unless intended to include in the definition services performed, not on a farm and in connection with farming operations, but elsewhere in the conduct of a new kind of business that is not farming, but intimately related to agriculture. Whoever devised this language—whether Congress or legislature—must have intended to add something to what had been already enumerated. We should not treat the language as superfluous or as surplusage.

The purpose of the exemption or exclusion of "agricultural labor" from the Employment Security Law was surely not to exclude a certain class of *employees* from the benefits of social security legislation. Presumably an unemployed farm laborer suffers just as much as any other unemployed workman and his unemployment is just as serious a threat to our economy as is any other involuntary idleness. He is not excluded from the benefits because of any lack of merit in himself but because of the unwillingness of Congress and the legislature to burden the *industry* in which he is engaged. That seems a necessary conclusion. And if it be assumed, as we think it must, that the purpose here was to broaden the definition of agriculture to include commercial hatcheries, there seems no reason or logic in construing the language to exempt the wages of certain hatchery employees, while taxing the wages of others.

There is other internal evidence pointing to the conclusion that the term "agricultural labor" was not intended to be limited to labor that was strictly agricultural in character or related directly to farming operations.

In both the first and second unnumbered subparagraphs of paragraph (4) which we have set out in full, and in the fourth which we have not quoted, it is made clear the services described are those performed *on farms* or those directly related to farming operations. In the fourth, which refers to activities not in their nature so closely related to actual farming, it is expressly provided:

"* * * but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable * * * to service performed in connection with commercial canning * * *." Section 96.19, subsection 7, paragraph $g(4)$.

The third unnumbered subparagraph with which we are concerned here contains no such limiting language to exclude commercial enterprises. The fact that it does not and that the other subparagraphs do is significant of the intent of the legislative bodies.

We find no decision precisely in point except the Birmingham case above discussed. However there are two cases cited therein in which the same court construed language of the "Fair Labor Standards Act" (29 U. S. C. A., section 201 et seq.) somewhat analogous to the language we are considering. See Miller Hatcheries v. Boyer, 8 Cir., Iowa, 131 F. 2d 283, and Walling v. Rocklin, 8 Cir., Iowa, 132 F. 2d 3. They illustrate the tendency of that court toward a broad construction of the term "Agriculture" as used and defined in recent federal social legislation. The language of the "Fair Labor Standards Act" is set out in footnote to the Miller Hatcheries case and the court points out that the administrator of the Wage and Hour Division has consistently interpreted the operation of a commercial hatchery to constitute "the raising of * * * poultry" and holds that employees engaged in the *necessary incidents of these operations* are therefore "employed in agriculture."

It should be pointed out that two of the federal cases cited by appellant as tending to support its contention were decided under the Social Security Act as it stood prior to the Amendment of August 10, 1939. See Jones v. Gaylord Guernsey Farms, 10 Cir., Okla., 128 F. 2d 1008, and Larson v. Ives Dairy Co., 5 Cir., Fla., 154 F. 2d 701. Another cited case affords no particular comfort to appellant. United States v. Navar, 5 Cir., Tex., 158 F. 2d 91. Miller v. Burger, 9 Cir., Cal., 161 F. 2d 992, also cited, involved services performed in what the court held to be a "terminal market" within the

meaning of the paragraph of the Social Security Act identical with the fourth unnumbered subparagraph of section 96.19, subsection 7, paragraph $g(4)$ of our statute. It is not in point here.

IV. The interpretation we place upon the phrase in "connection with" is not strained or without precedent. In Wallrabenstein v. Industrial Commission, 195 Wis. 15, 17, 18, 216 N. W. 495, 496, the court construed an insurance coverage of "all employees of whatever nature * * * engaged upon or in connection with such farm," to include a household domestic: "The service performed by appellant in caring for the farm home of her employer was clearly a service necessary to be performed *in connection with* the farm * * *." (Italics supplied.) The court said it was significant that the coverage was not limited to labor "engaged upon" the farm. It also said an express exclusion of "clerical office force" referred to a class of employees which would otherwise have been included in the phrase "in connection with."

In Gurney v. Atlantic & G. W. Ry. Co., 58 N. Y. 358, 371, it was held that a court order directing a receiver to pay wages for labor performed "in connection with that company's railways" was intended to embrace every service rendered in promoting the interest and enforcing and defending the rights of the company in respect to its railways in its possession and under its management.

Doubtless the language must be construed in the light both of its context and its purpose. This we have tried to do. We think the sound reasoning of the Birmingham case and the considerations we have pointed out require an affirmance of the trial court's decision and it is so ordered.—Affirmed.

All JUSTICES concur.