STATE of Iowa ex rel. Richard C. TURNER, Attorney General, Appellee,

v.

KOSCOT INTERPLANETARY, INC. et al., Appellants.

No. 54577.

Supreme Court of Iowa.

Nov. 11, 1971.

Lawyer, Lawyer & Dunn, Des Moines, for appellants.

Richard C. Turner, Atty. Gen., and Douglas R. Carlson, Asst. Atty. Gen., for appellee.

RAWLINGS, Justice.

Plaintiff State, by Attorney General as relator, brought action June 5, 1970, under The Code 1966, Section 713.24, and amendment thereto by the Second Regular Session, Sixty-Third General Assembly, Chapter 1277 (The Code 1971, Section 713.24 [2b] ) seeking, *inter alia*, to enjoin defendants from engaging in alleged consumer fraud sales practices. By answer defendants generally denied plaintiff's allegations and challenged constitutionality of the Act, claiming it violates United States Constitution, Amendment 14, and Iowa Constitution, article I, section 9. Trial court found

permanent injunctive relief should be granted as prayed. Defendants take permissive interlocutory appeal. We affirm.

Only Divisions I and II of plaintiff's petition are here involved.

The first division asserts, in substance, defendants have been and are engaged in referral sales techniques which include promises not contained in any written contract, contrary to The Code 1966, Section 713.24(2b), which provides:

> "The advertisement for sale, lease or rent, or the actual sale, lease, or rental of any merchandise at a price or with a rebate or payment to the purchaser which is contingent upon the procurement of prospective customers provided by the purchaser, or the procurement of sales, leases, or rentals to persons suggested by the purchaser, is declared to be an unlawful practice, *unless the agreement or promise of such contingent price, rebate, or payment, is in writing and made a part of the contract of such sale, lease or rental.* The rights and obligations of the contract relating to such contingent price, rebate, or payment shall be interdependent and inseverable from the rights and obligations relating to the sale, lease, or rental." (Emphasis supplied.)

Division II alleges, essentially, defendants' referral sales practices are proscribed by § 713.24(2b) as amended, *supra*, effective July 1, 1970, now incorporated in the same section of the 1971 Code, which states:

> "The advertisement for sale, lease or rent, or the actual sale, lease, or rental of any merchandise at a price or with a rebate or payment or other consideration to the purchaser which is contingent upon the procurement of prospective customers provided by the purchaser, or the procurement of sales, leases, or rentals to persons suggested by the purchaser, is declared to be an unlawful practice rendering any obligation incurred by the buyer in connection therewith, complete-ly void and a nullity. The rights and obligations of any contract relating to such contingent price, rebate, or payment shall be interdependent and inseverable from the rights and obligations relating to the sale, lease, or rental."

It is thus evident the amendment served, in effect, to per se make illegal any use of what is known as referral sales programs, rather than allowing their usage if attendant promises made were manifested in writing.

Trial commenced August 27, 1970, and at close of all evidence the Court, as aforesaid, entered an "Order for Permanent Injunction."

The record discloses defendant Koscot Interplanetary, Inc. of Orlando, Florida (Koscot), is a Florida corporation, representatives of which have apparently been doing business in Iowa since early 1969. Defendant Glenn W. Turner, a Florida resident, is the organizer and board chairman of Koscot. Defendant Eastern Iowa Distributors, Inc., of Bettendorf, is an Iowa corporation composed of distributors for Koscot, and acts as its local representative. Defendant Koscot Kosmetic Distributors, of Des Moines, is a voluntary association of distributors in that area, engaged in the sale of Koscot's cosmetic products and the promotion of a distribution network.

An examination of the Koscot program discloses it is fundamentally a sugar coated merchandise sales plan.

A "beauty advisor" initially pays $10 and for this receives her "starter kit" of Koscot products to be refurbished as required. Any person buying in as a "supervisor" remits $2000 for which he receives $1500 worth of cosmetics and $500 hair fashions, retail value. A distributor pays $5000 for which an opening Koscot inventory is supplied.

Those buying in at each of the above three levels are, of course, expected to sell Koscot products to others.

As a merchandise sales inducement, Koscot promotes a "get rich quick" position scheme. Under this arrangement defendants have been and are selling merchandise and positions to many residents in Iowa.

Product sales and the selling of positions are effected via use of the aforesaid "multilevel—distributorship—supervisor pyramid sales techniques" through which individuals considering position purchases are induced to buy upon the assurance that once "bought in" they will have the right to bring or refer other prospective merchandise-position buyers to the company and receive payment from Koscot for each such referral.

Product and position sales are advanced through use of what defendants term "Golden Opportunity Meetings" where local distributors present the Koscot sales and distributorship—supervisor program to individuals who have evidenced an interest in buying a merchandising job. The presentation procedure used at these meetings ordinarily follows quite closely that contained in the sales pitches set forth in Koscot's publication, identified as "The Distributor's Training Manual." (Plaintiff's Exhibit B).

Sales presentations are there usually made to prospective customers brought by other individuals who have already purchased, either as a "supervisor" or "distributor", because they have been orally promised payment, as aforesaid, for each like position sold on referral. Koscot strongly recommends all presentations at local "Golden Opportunity Meetings" be in accord with the written procedures contained in the manual.

Under the sales program employed by defendants every new supervisor or distributor must be referred or sponsored by an existing position holder. When a prospect referred to Koscot later buys in, the referring party is promised a portion of the amount paid by such purchasing party. Newly obtained supervisors and distribu-

tors are required to initially pay $2000 and $5000 respectively.

More specifically, as best we can determine, the reimbursement to a supervisor referring another individual, who in turn buys a supervisor post, is $500 out of the new member's $2000 purchase price. Payment to a distributor who refers another buying individual into Koscot as a supervisor is $500 out of the new member's $2000 payment, plus a ten percent override commission, making a total of $700 to be received by a distributor for securing an additional supervisor. When a distributor has sponsored a supervisor into the company and the new supervisor later purchases a distributor's position for an additional $3000, the fee then paid to the referring distributor is $1950. Since a supervisor must replace himself before buying up to a distributorship, the referring party will receive an additional $200 whenever the sponsored supervisor finds a replacement.

There are other intricate referral payment incentives involved but the foregoing will instantly suffice.

In brief, the sales pitch employed by defendants discloses, individuals are induced to buy into their program through use of the foregoing presentation, with an attendant glowing assurance that the prospect can easily earn $34,000 each year merely by obtaining other Koscot merchandise and position purchasers.

The written contract between Koscot and those who buy does *not*, as aforesaid, include any part of the promised payment for securing additional supervisors or distributors.

When an individual buys in as supervisor or distributor he must make payment by certified or bank check payable and always delivered to Koscot. All remittances to referring position holders, *supra*, are made from Koscot's Florida office.

On appeal defendants contend trial court erred in holding the Act is not unconstitu-

tional, and their sales program is statutorily prohibited.

I. This declaratory judgment action was tried and determined in equity. Our review is accordingly de novo. Bjork v. Dairyland Insurance Company, 174 N.W. 2d 379, 382 (Iowa). See Denning v. Denning, 185 N.W.2d 238, 239–240 (Iowa).

II. In undertaking an assault upon the constitutionality of § 713.24, Code 1966, defendants assume a heavy burden.

The legislature is free to enact any law provided it is not clearly prohibited by some provision of the Federal or State Constitution. It is not for the judicial branch of government to determine whether any legislative enactment is wise or unwise. And every reasonable presumption must be indulged in support of a controverted Act, any doubts being resolved against the challenging party. We must also look to the object to be accomplished, evils sought to be remedied, or purpose to be subserved in the interpretation of a statute, according to it that reasonable and liberal construction which will best serve to attain such object rather than one which will defeat it. See Farrell v. State Board of Regents, 179 N.W.2d 533, 537–538 (Iowa).

III. And as we have consistently held, the legislature may be its own lexicographer. E. g., State v. Social Hygiene, Inc., 156 N.W.2d 288, 292 (Iowa).

IV. Defendants contend, however, § 713.24(2b) of the 1966 Code, is penal in nature and must be strictly construed.

Admittedly the Act is editorially set forth in the criminal section of our Code, but that alone is not determinative. See General Mortgage Corp. of Iowa v. Campbell, 258 Iowa 143, 151, 138 N.W.2d 416; State v. Gute, 252 Iowa 294, 297, 106 N.W. 2d 417, and citations. Neither would this enactment be instantly subject to strict interpretation even if a penalty could also be imposed thereunder.

Most courts separate the remedial and penal sections of a legislative enactment where both are involved. Resultantly the Act is interpreted liberally where remedy is sought, strictly when the action brought is penal. We adopt that view. See 50 Am.Jur., Statutes, § 423; 82 C.J.S. Statutes § 390; 2 South Carolina L.Rev. 189 (1949–1950).

A law providing regulations conducive to public good or welfare, such as suppression of fraud, is ordinarily remedial, and as such liberally interpreted. United States v. Stowell, 133 U.S. 1, 10 S.Ct. 244, 245–246, 33 L.Ed. 555; Schmitt v. Jenkins Truck Lines, Inc., 260 Iowa 556, 560–561, 149 N.W.2d 789; Osgood v. Names, 191 Iowa 1227, 1230, 184 N.W. 331; 50 Am.Jur., Statutes, § 15; 82 C.J.S. Statutes § 388.

An act penal in nature is generally one which imposes punishment for an offense committed against the State and is accordingly interpreted strictly. See State v. Watts, 186 N.W.2d 611, 614 (Iowa); State v. Nelson, 178 N.W.2d 434, 437 (Iowa); 50 Am.Jur., Statutes, § 16; 82 C.J.S. Statutes § 389. See also Stevenson v. Stoufer, 237 Iowa 513, 516–517, 21 N.W.2d 287.

Furthermore, injunctive relief is in no sense penal, being distinctly an equitable remedy. Rule 320, Iowa R.Civ.P.; 42 Am.Jur.2d, Injunctions, § 2; 43 C.J.S. Injunctions § 1; cf. Iowa Natural Resources Council v. Van Zee, 158 N.W.2d 111, 115 (Iowa).

Neither does a statutory provision for reimbursement or refunding of moneys obtained from others by fraudulent means, absent any penalty, or the filing of a petition seeking such redress, make the act penal in nature. See Schmitt v. Jenkins Truck Lines, Inc., *supra*; State v. Cowen, 231 Iowa 1117, 1120–1125, 3 N.W.2d 176; 50 Am.Jur., Statutes, §§ 15–16; 82 C.J.S. Statutes §§ 388–389.

In the instant action, Code § 713.-24(2b), both in its original form and as amended, *supra,* is remedially invoked and will be accorded a liberal interpretation.

V. This court has also repeatedly held the State may, under its police power, constitutionally regulate a legitimate business which is detrimental to the people if not properly conducted, or even prohibit a business activity found to be essentially injurious to public welfare. E. g., Brady v. Mattern, 125 Iowa 158, 162, 100 N.W. 358. See Breard v. City of Alexandria, 341 U.S. 622, 632–633, 71 S.Ct. 920, 927, 95 L.Ed. 1233.

This includes sales practices or promotional schemes legislatively deemed, within constitutional confines, to be fraudulent. Cedar Memorial Park Cemetery Ass'n v. Personnel Associates, Inc., 178 N.W.2d 343, 349 (Iowa); Davenport Hospital Ass'n v. Hospital Service, 261 Iowa 247, 257, 154 N.W.2d 153; Steinberg-Baum & Co. v. Countryman, 247 Iowa 923, 931–935, 77 N.W.2d 15; Loftus v. Department of Agriculture, 211 Iowa 566, 572, 232 N.W. 412. See 16 Am.Jur.2d, Constitutional Law, § 372; 16 C.J.S. Constitutional Law § 187.

VI. By the same token it cannot be said the Act in question infringes upon defendants' constitutionally protected liberty of contract.

It is well established, laws having for their purpose the legitimate protection of health, safety, morals and welfare of the people are not constitutionally prohibited. And where, as here, state legislation addressed to that end is reasonable and appropriate, all contracts are subject thereto. Des Moines Joint Stock Land Bank v. Nordholm, 217 Iowa 1319, 1326, 253 N.W. 701; Hunter v. Colfax Consolidated Coal Co., 175 Iowa 245, 282–287, 154 N.W. 1037; 16 Am.Jur.2d, Constitutional Law, § 289; 16 C.J.S. Constitutional Law § 210. See 17 Am.Jur.2d, Contracts, § 165; 17 C.J.S. Contracts § 201; 6A Corbin on Contracts, §§ 1374–1376.

It is to us apparent Code § 713.24 (2b) was enacted for the beneficent purpose of suppressing merchandise sales practices or conduct which constitute a fraud upon the people.

Although the term "fraudulent conduct" is not subject to a precise definition, it does include "referral" or "pyramid" sales arrangements by which people are induced to buy upon the representation they can reduce or recover their purchase price, or earn untold profits by referring other buying prospects to the seller. See The Code, Section 4.1(2); Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 298–301, 66 S.Ct. 1100, 1102–1104, 90 L.Ed. 1244; Florida Discount Centers, Inc. v. Antinori, 226 So.2d 693, 694–695 (Fla.); M. Lippincott Mortgage Investment Co. v. Childress, 204 So.2d 919, 921–922 (Fla.); Commonwealth v. Allen, 404 S.W.2d 464, 466–467 (Ky.); State by Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303, 315–327; People v. Federated Radio Corporation, 244 N.Y. 33, 154 N.E. 655, 657; Sherwood & Roberts-Yakima, Inc. v. Leach, 67 Wash.2d 630, 409 P.2d 160, 162–164 (Wash.); 37 Am.Jur.2d, Fraud and Deceit, § 26; 5 Buffalo L.Rev. 669; Annos. 14 A.L.R.3d 1420, 1423.

VII. But defendants take the position use of the word "contingent" in § 713.24 (2b) makes the Act inapplicable to them. This stand is apparently premised upon the claim, " * * * contingent upon the procurement of prospective customers provided by the purchaser, or the procurement of sales * * * to persons suggested by the purchaser * * *", means sale of merchandise must, *at time of the sale,* be contingent, and the rebate or payment must be an integral part of such sale or procurement.

As best we can determine defendants contend the sale itself must be contingent upon given factors rather than that rebate or payment be conditioned upon future procurement of customers provided

by the purchaser. This is a novel but non-persuasive approach.

The statute, when fairly read says, to the extent here applicable, any sale at a price *or with a rebate or payment conditioned upon procurement* of sales to customers is unlawful. Stated otherwise the contingency factor operates both in praesenti and in futuro.

The futuristic element is clearly made an integral part of the Act because the promised rebate or payment is specifically *contingent upon* procurement of sales to persons suggested by the purchaser.

"Contingent" means likely, but not certain to occur; possible; happening from unforeseen causes; subject to unforeseen conditions; accidental or incidental; chance; unpredictable because affected by or dependent upon something which may or may not later occur. See The Code, Section 4.1(2); Cametal Corp. v. National Automobile & Cas. Ins. Co., 189 Cal.App.2d Supp. 831, 11 Cal.Rptr. 280, 283; Button v. Day, 205 Va. 629, 139 S.E.2d 91, 100.

"Upon" as here statutorily used means, as soon as; at the time of; in case of. See The Code, Section 4.1(2); Sanford v. Luce, 245 Iowa 74, 77, 60 N.W.2d 885.

It is thus evident § 713.24(2b) makes unlawful the sale of merchandise with a rebate or payment to the purchaser to be made or paid in case or at time of the happening of some unforeseen sale to persons suggested by the purchaser.

Despite the thinly veiled cloak of respectability with which Koscot has attempted to clothe its pyramidal merchandise sales promotion scheme, the badge of fraud clearly shows through.

As demonstrated, *supra,* the pyramiding referral sales scheme devised and here put into effect by defendants is distinctly within the ambit of those activities proscribed by

Code § 713.24(2b), both in its original form and as amended.

VIII. Defendants' attack upon the constitutionality of § 713.24(2b) is generally premised upon the claim it is so ambiguous that men of common intelligence must guess at the meaning thereof and differ as to its application. We disagree.

In support of their position defendants cite two criminal cases which, for reasons stated above, are inapplicable.

This court has said "ambiguous" means, "'Of doubtful nature or meaning; uncertain; having a double meaning; open to various interpretations; equivocal.'" McCarthy v. McCarthy, 162 N.W.2d 444, 448 (Iowa).

Certainly we should not reach for or create statutory obscurity and if men of ordinary intelligence can understand a statute, despite some possible areas of disagreement, it is not wanting in certainty. See State v. Dixon, 479 P.2d 931, 936 (Wash.); 50 Am.Jur., Statutes, § 226.

Neither is a legislative enactment unconstitutionally vague because clearer or more precise language could have been used. Lee Enterprises, Inc. v. Iowa State Tax Commission, 162 N.W.2d 730, 739 (Iowa).

Undoubtedly there are many legislative acts found in our Code which could, if so desired, be structurally, grammatically, and meaningfully so interpreted as to make them completely uncertain if not absurd. By such process men possessing more than common intellect might conceivably be unable to understand that which the average man clearly comprehends. This, however, is not the path which courts are permitted to follow.

The Federal Trade Commission Act, 15 U.S.C.A., § 45(a) (1) provides: "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

In Sears, Roebuck, & Co. v. Federal Trade Commission, 258 F. 307 (7 Cir.), this enactment was challenged as being ambiguous. Holding adverse to that claim the court aptly said, at 311:

"If the expression 'unfair methods of competition' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' 'unfaithfulness,' 'unfair use,' 'unfit for cultivation,' 'unreasonable rate,' 'unjust discrimination,' and the like. This statute is remedial, and orders to desist are civil; but even in criminal law convictions are upheld on statutory prohibitions of 'rebates or concessions' or of 'schemes to defaud', without any schedule of acts or specific definition of forbidden conduct, thus leaving the courts free to condemn new and ingenious ways that were unknown when the statutes were enacted. Why? Because the general ideas of 'dishonesty' and 'fraud' are so well, widely and uniformly understood that the general term 'rebates or concessions' and 'schemes to defraud' are sufficiently accurate measures of conduct.

"On the face of this statute the legislative intent is apparent. The commissioners are not required to aver and prove that any competitor has been damaged or that any purchaser has been deceived. The commissioners, representing the government as parens patriae, are to exercise their common sense, as informed by their knowledge of the general idea of unfair trade at common law, and stop all those trade practices that have a capacity or a tendency to injure competitors directly or through deception of purchasers, quite irrespective of whether the specific practices in question have yet been denounced in common-law cases."

See Coplin v. United States, 88 F.2d 652, 657–759 (9 Cir.).

As originally enacted (1966 Code) the Act, in part, proscribed any advertisement for sale of merchandise with attendant rebate or payment to the purchaser contingent upon procurement of prospective customers by the purchaser *unless the agreement or promise of such rebate or payment be set forth in the written sales contract.*

Then the Act, as amended, effective July 1, 1970 (1971 Code) in effect, makes such sales unlawful, per se, regardless of any contract terms between seller and buyer.

Foundationally, the meaning of the foregoing enactments can here, as always, be best determined by recourse to their underlying purpose.

■ Unquestionably the legislature thereby intended to protect the public against unscrupulous and deceptive merchandise selling practices. More specifically the legislative purpose was to, among other things, brand all pyramiding referral merchandise sales schemes as a cancerous vice against which the public should be protected and for that reason suppressed. This it did in the 1966 Code, more effectively by the amendment, both *supra*, with sufficient clarity to meet constitutional standards.

The writ for which trial court made provision in the "Order for Permanent Injunction" shall issue. To that end any stay order heretofore entered herein is dissolved and set aside.

Affirmed.

All Justices concur, except LeGRAND, J., who concurs in the result.