694 N.W.2d 518 (2005)
STATE of Iowa ex rel. Thomas J. MILLER, Attorney General of Iowa, Appellant,
v.
CUTTY'S DES MOINES CAMPING CLUB, INC., Appellee.
No. 03-0934.
Supreme Court of Iowa.
April 1, 2005.
*520 Thomas J. Miller, Attorney General, and Kathleen Keest and Benjamin Bellus, Assistant Attorneys General, for appellant.
David A. Tank of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellee.
STREIT, Justice.
A Des Moines area campground club waged a tough campaign to compel hundreds of ex-campers to pay it dues. The Attorney General, claiming the campground club was engaging in an "unfair practice" in violation of Iowa's Consumer Fraud Act, filed suit to stop the collection efforts. The district court dismissed the Attorney General's case on the campground club's motion for summary judgment, and the court of appeals affirmed. We conclude dismissal was not proper. We vacate the decision of the court of appeals, reverse the district court judgment, and remand for further proceedings.

I. Facts and Prior Proceedings

A. The Development of the Campground
In 1980, Cutty's Incorporated ("the Developer") developed a private recreational vehicle park and campground resort ("campground") on approximately eighty acres of land near Des Moines. For six years, the Developer purported to sell "1/3000 undivided interests" in the property to prospective campers. Although we adopt the "undivided interests" terminology in the remainder of this opinion, we do not decide the precise nature of what the buyers actually purchased. Compare Kovach v. Erie Islands Resort & Marina, 93 Ohio App.3d 11, 637 N.E.2d 382, 383 (Ohio Ct.App.1994) (interest in real estate), with All Seasons Resorts, Inc. v. Abrams, 68 N.Y.2d 81, 506 N.Y.S.2d 10, 497 N.E.2d 33, 38 (1986) (not interest in real estate).
*521 Each buyer paid the Developer between $3000 and $5700 for the "1/3000 undivided interest," depending upon whether the buyer paid the Developer up front or financed the purchase through an installment sales contract. The typical installment sales contract stated that upon payment in full, the Developer would deliver to the buyer a deed conveying title to the undivided interest as a tenant in common with all the owners of the other undivided interests.
The undivided interests were subject to a Declaration of Restrictions ("the Restrictions") on the campground property. The Restrictions, which the Developer recorded in 1980, were variously referred to as "covenants," "conditions," and "easements and cross-easements in fee." By their own terms, the Restrictions ran with the land. The Restrictions were "binding upon the present title holder[s] ... and their respective heirs, assigns, and successors...."
Ownership of an undivided interest gave the buyer access to the campground and use of the campground's amenities, which included an indoor pool, whirlpool, sauna, miniature golf course, tennis courts, various "play areas," and a fishing lake with paddle boats. Buyers did not own a specific campsite. Partition of the property was restricted, and some buyers' contracts prohibited them from recording their undivided interests. On the other hand, owners of undivided interests were permitted to sell, give, or devise them to others, so long as they paid a fee to a third party, Cutty's Des Moines Camping Club, Incorporated.

B. The Club
At the same time the Developer recorded the Restrictions and began selling undivided interests, it simultaneously created Cutty's Des Moines Camping Club, Incorporated ("the Club"). The Club was set up to manage and operate the campground. It also had the sole power to assess, collect, enforce, and spend dues for the benefit of the property.
The Club claims the purchase of an undivided interest automatically made a buyer a member of the Club and obligated the buyer, as well as the buyer's grantees and heirs, to pay the Club dues each year for the upkeep of the property.[1] Dues were also necessary because the Restrictions required the Club to pay all property taxes levied on the campground.
The Restrictions and the Club's bylaws contemplated various measures for members who did not pay their annual dues. The Restrictions stated those who did not pay their dues were personally liable for failing to do so. The Restrictions also stated that unpaid dues "shall be a lien upon said Membership and Undivided Interest until paid." Lastly, the Restrictions *522 granted the Club the right to purchase an undivided interest at a discounted price if a membership were "terminated" for failing to pay dues. The Club, however, has never perfected a lien upon an undivided interest and has not purchased a "terminated" member's interest.
The Club's bylaws outlined a more specific procedure for addressing the nonpayment of dues. The bylaws stated that if a member did not pay his dues, the Club was required to notify him that he was a "delinquent member." Upon certification to the Club's five-member Board of Directors that a member was delinquent
by a majority vote of the Board of Directors, such member may be suspended from Membership in the Club. Any voting member so suspended shall not be entitled to vote [or] use Club facilities.... The Membership of any member who remains suspended for a period of six (6) months shall be automatically terminated....
Elsewhere, the bylaws stated that
[t]ermination of a Voting Membership shall constitute a forfeiture, abandonment, surrender, release and relinquishment of all interest of such terminated voting member ... in and to the Club and its Property, and such terminated member shall ... have no rights thereto or therein unless reinstated by the Board of Directors.
The Club did not send out "delinquent member" notices as required in its bylaws. Nor did it ever avail itself of this termination procedure.[2] The Club's longtime manager testified the Club has not terminated anyone's undivided interest in decades, if ever.
In the early to mid-1980s, the Developer sold 2100 of the 3000 undivided interests it had created. In 1986, the Developer stopped selling undivided interests. Today the Developer retains 900. The Club owns another 400 undivided interests. (The Club received most of these interests from former members.) Should the campground ever be sold, proceeds will be divided proportionately based upon the number of undivided interests owned.
Dues are not insignificant. Although in 1980 the dues were $96 per year, today they are nearly $400 per year. For reasons that are not clear in the record, the Developer does not pay dues. The Club's 400 shares do not pay dues, either.
A five-member Board of Directors runs the Club. The Developer controls the Board. (In another lawsuit in California, the owner of the Developer conceded he controlled the Des Moines Club.) Although each owner of an undivided interest is entitled to one "voting membership" in the Club, every election the Developer votes its block of 900 shares by proxy. Because the Club holds 400 non-voting shares and many individual campers do not or cannot vote, the Board is perpetually run by three directors nominated by the Developer. These three Board Members, one of whom is the Developer's owner, live out-of-state and rarely, if ever, visit the campground. Two local campers round out the remaining seats on the Board.

C. The Collection Campaign
In October 2001, the Club initiated an aggressive collection campaign against owners of undivided interests who had not paid their dues over the years. Many of the owners targeted by the campaign had *523 never visited the campground or stopped using it long ago. They stopped paying dues anywhere from four to sixteen years ago, and some heard nothing after they quit paying. Matters of proof were complicated by the fact that a fire in 2000 destroyed the vast majority of the Club's records  including copies of dues statements it claims it sent to owners.
The Club maintained the purchase of an undivided interest obligated the buyer to pay annual club dues for life, unless the buyer found someone to purchase (or accept as a gift or devise) the undivided interest. Although some owners have managed to dispose of their undivided interests over the years, others have not been able to do so. At least one owner found a buyer only to have the Club prevent him from selling it; there is also evidence the Club has waged a campaign to stop "cheap membership sales" so as not to bring "undesirable" owners to the RV park and campground. Some owners have tried to give their undivided interests to the Club for free, but the Club would not accept them.[3]
Some owners of undivided interests who purchased from another owner in a resale (as opposed to directly from the Developer) claim they were never told by their seller they could not cancel their memberships and were not provided the documents other owners received that allegedly spelled out their purported obligations. At least one ex-camper, however, claims her undivided interest was "terminated" only to have the Club later seek payment for dues that accrued after that date.
The collection campaign began with an amnesty program. The Club briefly offered to settle some of its claims against certain buyers (some of which were alleged to owe as much as $4000 in unpaid dues) if the buyer paid the Club $350 within thirty days. In exchange for payment, the Club would forgive all past dues and accept a quitclaim deed for the undivided interest, thus canceling all alleged future obligations. Some buyers took advantage of this program, others did not. Not all buyers received notice of the amnesty program.
The Club then sued buyers who still owed dues. The record contains a number of small-claims decisions and appeals in which the Club obtained judgments against owners of undivided interests. The judgments were almost uniformly grounded on the theory that the owner of an undivided interest subject to the Restrictions was akin to an owner of a condominium with a covenant. On this theory, Club members, like condominium owners, had to pay dues to support the common areas and, in the case of the owners of undivided interests, a share of the property taxes for the entire project; in either case, the landowner is subject to a covenant that runs with the land. After judgments were obtained, the Club garnished the wages and bank accounts of owners.

D. The Consumer Fraud Lawsuit
In late 2002, the Attorney General, on behalf of the State of Iowa, filed a lawsuit against the Club alleging it had engaged in "unfair practices" in violation of the Iowa Consumer Fraud Act. See Iowa Code *524 § 714.16(2)(a) (2001). The State sought injunctive relief, reimbursement, and a civil penalty, as well as investigative and attorneys' fees. See id. § 714.16(7), (11). The Club filed a motion for summary judgment. The Club argued the Consumer Fraud Act did not apply to this case, and, in any event, it had not engaged in an unfair practice.
The district court granted the Club's motion for summary judgment.[4] The court reasoned the case was "at its heart a dispute between dues-paying members and nonpaying members of a nonprofit corporation." The court ruled the Act did not apply absent a buyer-seller relationship between the consumer and the defendant. Even if the statute did apply, the court further held there was no "unfair practice" because there was no evidence of unavoidable injury. The court found it was undisputed that an owner's interest could "be sold, willed or given away at any time," and therefore the consumer could avoid the obligation to pay dues in the future. The State appealed.
The court of appeals affirmed, albeit for a different reason. The court held the Act did not apply because "no sale is implicated in the matters complained of here"; the State, it reasoned, was only complaining about "later conduct that is unrelated to the sale." The State sought further review, which we granted.

II. Principles of Review
Actions brought under the Consumer Fraud Act are tried in equity, Iowa Code § 714.16(7), so our review on appeal is ordinarily de novo. See, e.g., State ex rel. Miller v. New Womyn, Inc., 679 N.W.2d 593, 596 (Iowa 2004). Because this case was resolved on a motion for summary judgment, however, appellate review is for the correction of errors at law. See Coralville Hotel Assocs., L.C. v. City of Coralville, 684 N.W.2d 245, 247 (Iowa 2004) (review of an equity case resulting in summary judgment is at law).
Summary judgment is proper only if the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. We view the record in a light most favorable to the nonmoving party and indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a fact question.
Id. at 247-48 (citations and internal quotation omitted).
The State has the burden to prove violations of the Iowa Consumer Fraud Act by a preponderance of clear, convincing, and satisfactory evidence. State ex rel. Miller v. Pace, 677 N.W.2d 761, 767 (Iowa 2004).

III. The Merits: The Iowa Consumer Fraud Act

A. General Principles
The Iowa Consumer Fraud Act deems a variety of bad business practices unlawful. For the purposes of this appeal, an unlawful practice is defined as
[t]he act, use or employment by a person of an unfair practice.... in connection with the ... sale ... of any merchandise....
Id. § 714.16(2)(a). This same section of the Code defines "merchandise" broadly as including "any ... real estate or services." Id. § 714.16(1)(i). Although this definition of "merchandise" is counterintuitive, *525 see Black's Law Dictionary 1008 (8th ed.2004), "the legislature may be its own lexicographer." State ex rel. Turner v. Koscot Interplanetary, Inc., 191 N.W.2d 624, 629 (Iowa 1971). Whether one views the sale of an undivided interest as a sale of real estate or a service, it plainly falls within the purview of the Act. For this reason we need not decide the nature of the undivided interests in this appeal.
What is an "unfair practice"? On its face the term is dizzying in its generality. Guidance can be found, however, in the decisions of other states and in the definitional portion of the statute. Other courts have pointed out that an unfair practice is nothing more than conduct "a court of equity would consider unfair." S. Atl. P'ship v. Riese, 284 F.3d 518, 535 (4th Cir.2002) (emphasis omitted); see also Barquis v. Merchants Collection Ass'n, 7 Cal.3d 94, 101 Cal.Rptr. 745, 496 P.2d 817, 829-30 (1972); Harrington Mfg. Co. v. Powell Mfg. Co., 38 N.C.App. 393, 248 S.E.2d 739, 744 (1978). These courts have determined statutes that prohibit "unfair practices" are designed to infuse flexible equitable principles into consumer protection law so that it may respond to the myriad of unscrupulous business practices modern consumers face. See Barquis, 101 Cal.Rptr. 745, 496 P.2d at 829-30. The Iowa Code provides further guidance, insofar as an "unfair practice" is explicitly defined as
an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces.
Id. § 714.16(1)(n); cf. 15 U.S.C. § 45(n) (2000) (a practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"). Determining what constitutes an unfair practice is a "highly fact-specific inquiry" that will depend upon the circumstances of each case. See Riese, 284 F.3d at 535. In cases such as this one where the facts are disputed and open to different interpretations, a court should be especially wary to grant a motion for summary judgment.
At the Club's urging, the courts below have offered three primary reasons why the merits of this lawsuit should not be heard and summary judgment should be granted in favor of the Club as a matter of law. The Iowa Consumer Fraud Act, it was contended, does not regulate the collection campaign because (1) it is unrelated activity occurring after the sale; (2) the campers did not suffer unavoidable injury; and (3) the Club did not sell the undivided interests. We now examine each of these issues in turn. See Smith v. Shagnasty's Inc., 688 N.W.2d 67, 72 (Iowa 2004) (supreme court retains discretion to decide issues on review of decision of court of appeals, whether or not raised in the applications for further review).

B. The Act May Regulate Conduct Occurring After the Sale
The court of appeals held the Iowa Consumer Fraud Act did not regulate the Club's collection campaign because the campaign was "later conduct ... unrelated to the sale." Because the Club's collection campaign may be found to be "an unfair practice... in connection with the ... sale ... of ... merchandise," Iowa Code § 714.16(2)(a), we vacate the court of appeals' decision.

1. Defining "In Connection With" for Purposes of the Act
The Act does not define the phrase "in connection with." As a threshold matter, however, we point out that nothing in *526 the Act places a bright-line temporal limit upon the Act's purview, as the Club contends. The Act merely requires the activity be "in connection with," not "prior to" or "at the time of," the sale of the merchandise. Nothing in the phrase "in connection with" constrains the Act's scope to only those business practices occurring prior to or at the time of the sale. The legislature did not limit the Act in this way for a good reason:
The definitions presented in the Iowa Consumer Fraud Act are broad and comprehensive in order to effect the wide application of the Act.... These broad general definitional guidelines ensure the application of the Act in a wide variety of circumstances.
Note, Consumer Protection Under the Iowa Consumer Fraud Act, 54 Iowa L.Rev. 319, 325 (1968) [hereinafter ICFA Article]; cf. Am. Fin. Servs. Ass'n v. FTC, 767 F.2d 957, 980 (D.C.Cir.1985) ("It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field." (Citation omitted.)). While definition "is primarily a matter of drawing lines or distinguishing between one kind of thing and another," see H.L.A. Hart, The Concept of Law 13 (2d ed.1994), nothing in the legislature's use of "in connection with" in the Act enunciates a bright-line temporal rule. We will not judicially superinscribe one. To do so would not only violate well-established canons of statutory interpretation, but also conflict with the liberal interpretation we must give the statute. See Koscot Interplanetary, 191 N.W.2d at 630; ICFA Article at 325.
In the absence of a legislative definition, we note that the phrase "in connection with" is commonly defined as "related to, linked to, or associated with." Metro. Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co., 58 Mass.App.Ct. 818, 793 N.E.2d 1252, 1255 (2003); see also Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 930 (2d Cir.1998) (noting under Foreign Sovereign Immunities Act it is "well settled" an act is made "in connection with" commercial activity if there is a "substantive connection" or "causal link" between the two). It plainly has a broader reach than the phrases "arising out of," see Metro. Prop. & Cas. Ins. Co., 793 N.E.2d at 1255, and "contained in." In re Pierce, 95 B.R. 154, 158 (Bankr.N.D.Cal.1988). To show an unfair practice is "in connection with" the sale of merchandise, then, the attorney general need only show some relation or nexus between the two. See Metro. Prop. & Cas. Ins. Co., 793 N.E.2d at 1255; see also Black's Law Dictionary 1070 (8th ed.2004) (defining "nexus" as "[a] connection or link, often a causal one").
Other courts have recognized that post-sale conduct may be "in connection with the sale of merchandise." See, e.g., Lony v. E.I. du Pont de Nemours & Co., 821 F.Supp. 956, 962 (D.Del.1993) (holding post-sale activity may be "in connection with the sale"); Pack & Process, Inc. v. Celotex Corp., 503 A.2d 646, 658 (Del.Super.Ct.1985) (same); see also Celebrezze v. United Research, Inc., 19 Ohio App.3d 49, 482 N.E.2d 1260, 1261-62 (Ohio Ct.App.1984) (post-sale activity of suing consumers in distant fora fell within statute that stated "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction," where "consumer transaction" included the sale of any good or service). But see Norman Gershman's Things To Wear, Inc. v. Mercedes-Benz of N. Am., Inc., 558 A.2d 1066, 1074 (Del.Super.Ct.1989), aff'd on other grounds, 596 A.2d 1358 (Del.1991). Likewise, courts faced with broad language in consumer protection laws similar to Iowa's have also held that post-sale conduct may constitute an unfair practice. See, e.g., Showpiece Homes Corp. v. Assurance Co., *527 38 P.3d 47, 59 (Colo.2001) (holding post-sale activity actionable; if legislature had wanted to impose a temporal requirement, it knew how to do so); Elder v. Coronet Ins. Co., 201 Ill.App.3d 733, 146 Ill.Dec. 978, 558 N.E.2d 1312, 1320 (1990) (interpreting "in the conduct of any trade or commerce" to include a series of unfair acts in processing insurance claims); Hines v. Evergreen Cemetery Assoc., 865 S.W.2d 266, 269 (Tex.App.1993) (finding "no requirement that the defendant's act occur simultaneously with the sale"; "[s]o long as the goods or services form the basis of the plaintiff's claim" post-sale actions can violate state consumer protection law); Griffith v. Porter, 817 S.W.2d 131, 134 (Tex.App.1991) (similar); Salois v. Mut. of Omaha Ins. Co., 90 Wash.2d 355, 581 P.2d 1349, 1351 (1978) (refusing to limit state consumer protection law to unfair or deceptive practices "designed to induce a sale" of an insurance policy; consumer did not simply purchase a piece of paper, but rather "potential benefits and security of coverage" that would continue into the future). It appears those courts holding to the contrary have generally done so because the statute at issue required a showing of a fraudulent practice for the plaintiff to recover under the consumer protection law. See, e.g., Norman Gershman's, 558 A.2d at 1074 (citing 6 Del.Code Ann. tit. 6 § 2513(a)). Here, of course, the State may prevail even if it only shows an unfair practice.
"[D]eceptive and unfair practices are distinct lines of inquiry.... [W]hile a practice may be both deceptive and unfair, it may be unfair without being deceptive." Orkin Exterminating Co. v. FTC, 849 F.2d 1354, 1367 (11th Cir.1988). The disjunctive language of the Iowa Act clearly requires proof of only one, not both, sorts of conduct. See Commonwealth v. DeCotis, 366 Mass. 234, 316 N.E.2d 748, 753-54 (1974) (post-consummation conduct can be unfair even if pre-contract disclosure was not deceptive); accord Therrien v. Res. Fin. Group, Inc., 704 F.Supp. 322, 329 (D.N.H.1989). Recognizing this fact about the Iowa statute is important because
[d]eception occurs primarily (though not exclusively) at the formation stage of the contract. Conversely, unfairness occurs primarily (though not exclusively), with respect to the substance or performance of a contract.
Michael M. Greenfield, Consumer Law: A Guide for Those Who Represent Sellers, Lenders and Consumers § 4.1, at 161 (1995). Were we to interpret the phrase "in connection with" as containing an implicit per se rule barring all post-sale activity from the ambit of the Act simply because other courts have interpreted statutes which are directed only at fraudulent practices in such a manner would ignore the plain language of the Iowa statute and thereby eviscerate much of the statute's protection against unfair practices. We will not do so. Once again, the legislature chose broad language for a good reason, and we are compelled to interpret the statute as written.
The foregoing interpretation of the phrase "in connection with" is also consistent with prior precedent in this state. In Stromberg Hatchery v. Iowa Employment Security Commission, we were asked to decide whether, for purposes of Iowa's unemployment statute, hatchery employees who were not engaged in the manual process of incubating chicks were performing "agricultural labor." 239 Iowa 1047, 1048-54, 33 N.W.2d 498, 499-503 (1948). The unemployment statute defined "agricultural labor" as including "all services performed ... `in connection with'... the hatching of poultry." Id. at 1048, 33 N.W.2d at 499-500 (quoting Iowa Code § 96.19 (1946)). In our analysis, we *528 pointed out that the statutory language at issue was identical to that in the federal Social Security Act, see 26 U.S.C. § 1426 (1939), which was designed to relieve agriculture of the social security tax burden. See Stromberg, 239 Iowa at 1050-54, 33 N.W.2d at 500-02. We therefore concluded the statutory phrase "in connection with" should be interpreted liberally, and included employees not engaged in the manual process of incubating chicks. Id. Similarly, in the case at bar we are presented with a statute that serves a remedial purpose and must be interpreted liberally. See Koscot Interplanetary, 191 N.W.2d at 630; ICFA Article at 325. As in Stromberg, we will not impose a bright-line restriction  in this case a temporal one  upon the phrase "in connection with."

2. Application of the Facts
The difficult factual question posed in this case is whether the Club's collection campaign, itself admittedly post-sale conduct, is an unfair practice "in connection with" the sale of merchandise. Viewed in a light most favorable to the State of Iowa, we conclude the summary judgment record before us may show one. The State should get its day in court.
A trier of fact could find a nexus between the Developer's sales of the undivided interests in the early 1980s and the Club's collection campaign today. For example, a trier of fact could find the Developer established this entire elaborate arrangement, including continued control over the Club, from the outset to the substantial detriment of consumers. There is evidence in the record the Developer conceived, created, and has retained control over the Club throughout the years to the present day.[5] On this theory of the case, the Club is nothing more than the present-day operating arm of the Developer.
The Developer retains control over the Club because the Developer stopped selling undivided interests in 1986. Later the Developer solidified its control of the Club when the Club, presumably at the Developer's direction, started buying them up. By virtue of its controlling share, the Developer is able to maintain a sizeable interest in real estate free of property tax. All property taxes and improvements upon the property are paid for by the owners of all the other undivided interests. In doing so, the Developer and Club have reduced the number of dues-paying interests, thereby increasing proportionally the costs those that did buy must bear. A trier of fact may view this as unfair and in connection with the sale. Importantly, a trier of fact could find that at the time the consumers bought the shares they had every reason to believe all shares would be sold, or at least that any shares the Developer or the Club owned would be dues-paying shares. The documents the consumers received at the time of the sale apparently contemplated as much. In other words, a trier of fact could find the Developer and the Club have a duty to use good-faith efforts to sell their undivided interests. As matters stand, however, the Developer does not pay the Club dues and the Club, controlled by the Developer, does not require the Developer to pay them.
Even if the trier of fact were to take a narrower view, it could find the Club's collection campaign constitutes an unfair practice in connection with the sale of the undivided interest. The connection between the sale and the collection campaign is plain. All the Club's alleged rights vested *529 at the time of the sale and continue to this day on account of that transaction. See Hines, 865 S.W.2d at 269 (finding statute applies to post-sale conduct when sale gives rise to ongoing rights and obligations in the future); see also Bexley Vill., Ltd. v. Limbach, 68 Ohio App.3d 306, 588 N.E.2d 246, 248 (Ohio Ct.App.1990) (only furtherance of purpose, not unity of ownership, required to satisfy "connected with" element of statute). A trier of fact could find the Club sat on these rights for an unreasonable period of time. By all accounts the Club snoozed for as many as sixteen years. Bills were not sent. No collection efforts were undertaken. Termination procedures, spelled out in the installment contracts, the Restrictions, and the Bylaws, were not invoked. Only decades later did the Club awake from its slumber, track down ex-campers, and sue them for back dues. In light of the ambiguous nature of the Restrictions and Bylaws, owners of undivided interests could reasonably have thought under these circumstances their memberships were terminated when they stopped paying dues and ceased using the campground. In a variety of equitable doctrines developed over the years, we have long recognized the unfairness of one party unreasonably delaying the prosecution of an alleged claim against another party. See, e.g., Garrett v. Huster, 684 N.W.2d 250, 255-56 (Iowa 2004) (setting forth elements of laches and estoppel by acquiescence); Davidson v. Van Lengen, 266 N.W.2d 436, 439 (Iowa 1978) (explaining differences between two doctrines, as well as their underlying policies); see also Lake Caryonah Improvement Ass'n v. Pulte Home Corp., 903 F.2d 505, 509-10 (7th Cir.1990) (explaining laches doctrine in property context).[6]
Our decision today does not mean the Iowa Consumer Fraud Act grants the attorney general broad authority to police bad bargains. We have no quarrel with the fact some campers entered into bad bargains, insofar as they paid thousands of dollars for a small slice of a campground they rarely or never used. See Walker v. Gribble, 689 N.W.2d 104, 110 (Iowa 2004) ("Parties to contracts should not look to courts to rescue them from their bad bargains."). As other courts have recognized, conduct carried out pursuant to contractual relations does not often constitute an unfair or deceptive practice. See Riese, 284 F.3d at 536 (construing North Carolina law). For now, however, we think there is sufficient evidence in the summary judgment record before us to warrant a decision by the trier of fact. We remand for a decision on the merits.[7]

C. Unavoidable Injury
The district court determined there was no "unfair practice" because there was no evidence of unavoidable injury. See Iowa Code § 714.16(1)(n) (requiring *530 showing of unavoidable injury). The court found it was undisputed an owner's interest could be "sold, willed or given away at any time," thereby avoiding the obligation to pay any dues in the future.
We disagree and find there is evidence in this summary judgment record that the Club's unfair practice caused unavoidable consumer injury. Contrary to the district court, we find it is not undisputed that all consumers could sell their undivided interests. Moreover, the Club's actions may have had the effect of reducing the price the consumers might otherwise have received for their undivided interests; the Club apparently took active efforts to stop sales. The Club's amnesty program did not forestall substantial injury. Not all owners received the amnesty letters and, in any event, amnesty came with a significant price tag.
A trier of fact could also find consumer injury was unavoidable because the Club and the Developer, acting in concert with one another at the time of the initial transaction, used ambiguous documents to lure unwitting consumers into ownership of what are, in the Club's view, the equivalent of lifetime contracts. Similarly, a trier of fact may find consumers would not have anticipated that the Developer and the Club, again working together, would stop selling undivided interests and actively attempt to accumulate them  thereby unfairly reducing the number of dues-paying interests, and thus increasing, proportionally, the costs those who did buy must bear. If it is shown that the Developer and the Club created the circumstances that led to consumers purchasing 1/3000 undivided interests on the belief that all interests would be sold, a trier of fact could find all holders of undivided interests have suffered an unavoidable injury because the number of dues-paying shares was unfairly reduced.
Unavoidable injury is particularly acute for ex-campers. While the Club sat on its rights and slept, dues increased nearly fourfold and mounted exponentially without the knowledge of the ex-campers, who had long since abandoned the campground. For example, had the Club diligently pursued its rights and begun its collection campaign earlier, Club members may have sold their interests or used the facilities. An analysis that focuses solely on the fact the ex-campers can now sell their interests misses the mark. Even if we were to assume there is a market for the undivided interests, the sale of the interests does not allow the owners to avoid the injuries they have already suffered on account of the Club's delay in prosecution of its alleged claim. As matters stand now a trier of fact could find this delay has "so operated that it will be impossible to place the parties in status quo and enforcement of the [Club's] right would work inequity." Cf. Chadek v. Alberhasky, 253 Iowa 32, 40, 111 N.W.2d 297, 301 (1961). We vacate the decision of the court of appeals.

D. The Act Does Not Only Apply to Sellers of Merchandise
The district court ruled that because the Developer, and not the Club, sold the undivided interests, the Act could not regulate the Club's collection campaign. We disagree. Even if we were to assume that the Club is not the "seller" of the merchandise (our earlier discussion shows why we should not on the facts of this case), we do not take such a narrow view of the statute. The statute simply states "[t]he act, use or employment by a person of an unfair practice ... in connection with the ... sale ... of any merchandise ... is an unlawful practice." Iowa Code § 714.16(2)(a) (emphasis added). The term "person" is a general one that is not on its face limited to sellers, and we *531 see no reason to read such a limitation into the statute. As we recently pointed out, the Act
defines "person" broadly:.... "The term `person' includes any natural person or the person's legal representative, partnership, corporation ..., company, ... [or] business entity or association...."
New Womyn, 679 N.W.2d at 597 (quoting Iowa Code § 714.16(1)(j)). The Club is plainly a "person" for purposes of the Act, and therefore the Act applies in this case. Cf. Holeman v. Neils, 803 F.Supp. 237, 243 (D.Ariz.1992) (reaching same conclusion under similarly worded statute). The legislature knew how to limit this provision of the Act to sellers, for elsewhere in the Act the legislature expressly defined and employed the terms "buyers" and "sellers." See Iowa Code § 714.16(1)(b), (l). It did not do so here, and by all accounts did not do so for good reasons. We will not write in such a requirement; again, to do so would not only violate well-established canons of statutory interpretation but also conflict with the liberal interpretation we must give the statute. See Koscot Interplanetary, 191 N.W.2d at 630; ICFA Article at 325.

IV. Conclusion
The Iowa Consumer Fraud Act may regulate post-sale conduct. A trier of fact should decide whether the Club has engaged in an "unfair practice." Nor does the Act only apply to sellers of merchandise. Dismissal on the Club's motion for summary judgment was not proper.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS.
All justices concur except CARTER and TERNUS, JJ., who dissent.
CARTER, Justice (dissenting).
I dissent.
Perhaps the individual members who have failed to pay the prescribed dues can show a right to equitable relief from that obligation on some legal theory other than Iowa Code section 714.16(2)(a) (2001), but the action that has been brought by the attorney general based on that statute was properly rejected by the district court and the court of appeals.
The statute on which the attorney general's claims are based provides:
The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes, whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.
Iowa Code § 714.16(2)(a) (emphasis added). The key words are "in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes." These words limit the situations in which deceptive practices constitute a violation of the act.
Although I agree with the attorney general's argument that there may be instances in which events occurring subsequent to the sale or lease of merchandise are so preordained by the sale or lease transaction that they warrant action under section 714.16(2)(a), this is not such a situation. The collection efforts alleged to be improper were prompted by an unanticipated shortfall in dues collections that occurred *532 long after any sale. The collections were undertaken to enable the alleged victims' fellow subscribers to reap the benefit of their bargain. This attempt at collection of monies owed by defaulting members was clearly not undertaken in connection with any sale of merchandise, as required by section 714.16(2)(a).
I would affirm the decision of the court of appeals and the judgment of the district court.
TERNUS, J., joins this dissent.
NOTES
[1] Some of the legal instruments upon which the Club has relied to support this assertion are somewhat ambiguous. For example, the typical installment sales contract stated:

By virtue of Buyer's ownership of the undivided interest ..., Buyer is eligible for membership in the Club. Buyer agrees to pay to the Club when due, all dues and assessments required by or pursuant to the Bylaws of the Club, or the Declaration [of Restrictions]. (Emphasis added.) Likewise, the Restrictions opaquely stated each buyer would automatically become a member of the Club upon receipt of payment and approval of his or her application for membership by an officer of [the Developer]. (Emphasis added.) On the other hand, elsewhere the Restrictions, as well as the Club's bylaws, plainly mandated that
[t]he acceptance of a membership or Undivided Interest shall constitute an agreement that these Restrictions, the Bylaws and the Rules and Regulations ... are accepted, ratified and will be complied with.
(Emphasis added.)
[2] Although it appears a member must be suspended before termination occurs, another provision in the Club's bylaws implies that termination automatically occurs upon nonpayment of dues. That provision provides that "[v]oting Membership in the Club of any member shall terminate when a member ... [f]ails to pay his dues or assessments...."
[3] There is also evidence the Developer offered certain owners a "buy back program" at the time of the sale of the undivided interest. The Developer agreed to buy the undivided interest back at a discount, but only if its owner complied with a list of obligations over a seven-year period and then, within a specific thirty-day period, notified the Developer of the wish to do so. At least one owner called the Club to sell her undivided interest shortly in advance of the requisite buy-back period, but the Club did not buy her interest or remind her of this provision in the sales contract.
[4] The court also denied the Attorney General's request for a preliminary injunction. This ruling was not appealed.
[5] At this stage in the proceedings, today's Club should not be viewed in legal isolation from the Developer; pulling back the sheets, a trier of fact may yet find the Developer and the Club in bed together.
[6] We do not mean to suggest that any particular equitable doctrine is a valid defense for individual owners in their small-claims cases; those cases must be considered on their own merits and the doctrine must be carefully construed, where applicable. Here we only draw an analogy to show the Club's delayed collection campaign was arguably not equitable and therefore an "unfair practice" under the Iowa Consumer Fraud Act.
[7] We make no attempt to comprehensively define the parameters of the doctrine of unfair practices at this stage of the proceedings. As the matter progresses to trial, the evidence as developed may show an unfair practice in some other respect. Cf. Estate of Countryman v. Farmers Co-op. Ass'n, 679 N.W.2d 598, 605 n. 2 (Iowa 2004) (stating that on a summary judgment record alone "we make no attempt to define the precise parameters of the participation theory of liability and the type of participation that gives rise to liability under the doctrine").